# UNITED STATES DISTRICT COUT
## NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

| | | |
|---|---|---|
| **DIANE SCOTT HADDOCK,** | § | |
| **Plaintiff** | § | |
| | § | |
| **VS.** | § | **A CIVIL ACTION** _____ |
| | § | |
| **TARRANT COUNTY, TEXAS and** | § | |
| **PATRICIA BACA-BENNETT,** | § | |
| **Defendants** | § | **A JURY IS DEMANDED** |

## PLAINTIFF'S ORIGINAL COMPLAINT

This is a First Amendment retaliation case.  Defendant Baca-Bennett – an elected public official (a Texas state district judge) with the power to supervise and influence Plaintiff's employment and conditions of employment[1] – has abused that power and created a hostile work environment for Plaintiff by engaging in a pattern of retaliation against Plaintiff.  This pattern of retaliation has consisted of both public and private badgering, threats, back-biting, undermining and maligning, all in retaliation against Plaintiff for Plaintiff's husband's political views and activity, and Plaintiff's refusal of a direct command by Defendant Baca-Bennett that Plaintiff intervene to prevent Plaintiff's husband from engaging in such activity.

Defendant Tarrant County, Plaintiff's primary employer, has refused to protect Plaintiff from such retaliation despite the fact that Defendant Baca-Bennett's retaliatory activity was overt and public, and despite Plaintiff's having made Defendant Tarrant County aware of the hostile work environment it created.  Defendant Tarrant County is therefore equally culpable.  Plaintiff has a constitutional right to be free from political coercion and retaliation in her employment, and Defendants have violated that right by subjecting her to it.

---

[1] Plaintiff is employed by Tarrant County as an Associate Judge.

## PARTIES

1.   Plaintiff **DIANE SCOTT HADDOCK** is a resident of Tarrant County, Texas.

2.   Defendant **TARRANT COUNTY, TEXAS** is a local governmental entity organized under the State of Texas Constitution and which may be served with process, by serving the Tarrant County Judge, Glen Whitley, at the Tarrant County Courthouse, 100 Weatherford, Fort Worth, Tarrant County, Texas 76102.   Plaintiff is also serving upon Tarrant County District Attorney Sharen Wilson a copy pursuant to Texas law.

3.   Defendant **PATRICIA BACA-BENNETT** is an individual who may be served with process at her residence located at 1101 Doubletree Lane, Mansfield, Tarrant County, Texas 76063.

## JURISDICTION

4.   This case is brought under 42 U.S.C. §1983 for the violation of the plaintiff's first amendment rights.   The Court has jurisdiction of this case under 28 U.S.C. §§ 1331 and 1343.

5.   Venue is in the Fort Worth Division of the Northern District, pursuant to 28 U.S.C. § 1391.

## OVERVIEW OF PLAINTIFF'S CASE

6.   As noted in 1987 by then Chief Judge of the Seventh Circuit and well-known American jurist Richard Posner:

> "To retaliate against a man by hurting a member of his family is an ancient method of revenge, and is not unknown in the field of labor relations."[2]

7.   Plaintiff Diane Scott Haddock ("Plaintiff" or "Diane"[3]) has served Tarrant County loyally, diligently and faithfully as an Associate Judge in Tarrant County's family law courts for

---

[2] ***N.L.R.B. v. Advertisers Mfg. Co.***, 823 F.2d 1086, 1088 (7th Cir. 1987).
[3] Because Plaintiff's husband, Gerald Haddock, is featured prominently in the facts underlying this Complaint, and since they share the last name "Haddock," Plaintiff refers to them both by first name to ensure clarity and minimize confusion.

nearly twenty (20) years, and she is eminently qualified for that position.  She is the only family law judge in Tarrant County to be certified in judicial studies – family law – she has probably presided over 45,000 family law matters and has nearly thirty (30) years' experience in family law.

8.    One of Diane's supervising district judges, Bill Harris, as recently as December 31, 2017, described Diane as "the best AJ [Associate Judge] in the State."  He also described his court – the 233rd Judicial District Court – as "the most efficient court in Tarrant County (attributing it in no small part to their mutual efforts, including Diane's outstanding job performance).  (Exhibit 1). Serving as an Associate Judge in Tarrant County's family courts has not only been one of the most fulfilling endeavors of Diane's life, being a judge was a lifelong dream of hers since the age of seven (7).  Were she not to be allowed to continue, it would leave a huge void in her life and destroy a great deal of the happiness she has enjoyed serving Tarrant County for two decades.

9.    While trying to perform the duties of her job, Diane has been subjected – both publicly and privately – to severe and pervasive harassment and a hostile work environment.  This public and private harassment is making it more and more difficult for Diane to perform the functions of her job, as well as causing her significant emotional distress. The constant badgering, threats, back-biting, undermining and maligning – all both public and private – have come primarily (but not exclusively) from one of her supervising district judges – Patricia Baca-Bennett – in rather open and obvious retaliation against Diane for at least three specific and legally protected activities:

- Diane's refusal to advocate positions or patronize a judicial candidate Baca-Bennett endorses and supports (Diane's current fellow Associate Judge Jim Munford – a Republican candidate for 322nd Judicial District Court Judge);

- Diane's refusal to "get her husband [Gerald Haddock] under control" and stop him from supporting Munford's opponent in the election primary; and

- Diane's refusal to "get her husband under control" and stop him from engaging in and supporting political speech, in which he and others have

advocated for the Second Amendment – which became one of the central issues in the party primary during Munford's election campaign.[4]

Retaliating against a public employee for any of these reasons is illegal and violates her constitutional rights, as demonstrated in the following section.

## BACKGROUND FACTS SUPPORTING PLAINTIFF'S CLAIMS

10. Plaintiff would show the following timeline as the basis for her First Amendment retaliation claims:

### January 1, 1999 – Present:

Diane serves Tarrant County faithfully as "the best [Associate Judge] in the State [of Texas]," hearing approximately 2,500 cases per year, without a single mark on her employment record with Tarrant County; she ably assists in presiding over "the most efficient court in Tarrant County;" (Exhibit 1).

### August 4, 2016:

Diane's fellow Associate Judge Jim Munford – also a Tarrant County employee, appoints a campaign treasurer and begins filing reports regarding his intention to run in the 2018 election for 322nd District Judge, Tarrant County;

### June 26, 2017:

Diane appoints a campaign treasurer to run for "judge." At this time, she is not required to designate a specific judicial bench for which she is running, nor does she;

### June-August of 2017:

Diane's husband Gerald begins to receive phone calls from a Dallas attorney representing Jerry and Elizabeth Clakley – previous litigants in a much-publicized 2014 SAPCR[5] case in Diane's court.  Specifically, the Clakleys were attempting through their lawyer to extort money from the Haddocks for payment of legal fees relating to their alleged claims involving Leiliana Wright in exchange for their not filing suit against Diane.  The major thrust of the Clakleys' complaint against Diane was that Diane awarded possession of their granddaughter – Leiliana Wright – to Leiliana's mother, Jeri Quezada (who was later found criminally responsible for

---

[4] There were other issues Gerald considered significant and believed he had a responsibility to bring to light, such as Munford's personal history involving the treatment of women – particularly his former wife.
[5] Suit Affecting the Parent-Child Relationship

the child's 2016 death), supposedly after "taking a bribe" from Quezada.[6] Initially, the source of the specious "bribe" allegations was unknown;

### August-October of 2017:

Diane and her husband Gerald continue to hear rumors of the outrageous "bribe" allegation from other sources and begin to investigate. Their investigation ultimately leads them to Terry Munford – the wife of Jim Munford, Diane's would-be opponent were she to declare for the judicial race for the 322nd (as it was widely speculated she would do). The Haddocks learn for the first time that on April 13, 2017, Terry Munford had stated at a public gathering of Republican women that women in Cowtown Republican Women[7] are "corrupt," that "there are judges in that club who take bribes, come to work drunk and sit on the bench drunk," and that "there was one judge [in Cowtown Republican Women] who took a bribe to give custody to the mother," and "the child died because of this judge's action." It just so happened that Jennifer Olson was present at the time this statement was made at this meeting. Jennifer Olson is the person who repeatedly, as an advisor to the Clakleys, attempted to get the Clakleys to sue Diane because of the alleged bribes. She is a founder of the Protective Parents Coalition and has smeared Diane continuously in social media and other online forums – literally, for years. Gerald confronts Jim Munford and his campaign manager Ownby about Terry Munford's defamatory remarks. Neither denies she made them, both vow to make it right, but neither does.

### October 23, 2017 (Monday):

Diane has a courtroom full of lawyers and litigants but receives a text from Baca-Bennett stating she wants to see Diane "immediately" in Diane's chambers. Diane recesses her courtroom and adjourns to chambers, where Baca-Bennett meets her. Baca-Bennett states she is upset about a TFM[8] post in which Jim Munford was called a RINO ("Republican in name only"). Baca-Bennett appears equally upset that James Trimm, the author of the piece, told her to "stay out of it."[9]

---

[6] Significantly, what really happened in the *Leiliana Wright* case is that **the Clakleys had agreed in advance to the Order Diane signed giving Quezada custody and the Clakleys visitation**, apparently because the family law attorney representing them advised them that as Texas grandparents they had very few rights. As stated by Judge Harris to Fox 4 News: "[Diane] based her recommendations solely on the representations of all of the parties [including the Clakleys] and all of the attorneys of record [including the Clakleys' attorney]." In addition to the parties' decision not to present any evidence or information to Diane, Judge Harris also identified CPS's failures as "potentially one reason why some critical information didn't come to light" and he opined that "[i]t certainly appears the court should have been given evidence about the mother and her circumstances. I think it was tragic the court was never allowed to hear that evidence." *Judge on 4-year-old Grand Prairie girl's death: "I want to know what CPS knew,"* Fox4News.com, April 5, 2016. Numerous social media posts and web sites sought to hold Diane responsible, some even accusing her of "murder." See, for example, "Judge Diane Haddock ruling puts child in harms [sic] way" (www.ppcforchange.com/haddock-harms-way).

[7] Diane's membership in this club is well known.

[8] Tarrant Families Matter (TFM) is a public news organization founded by Gerald Haddock to disseminate information regarding numerous important public policy positions, such as protecting the independent nature of the judicial system, the rule of law, accurate reporting of news, traditional family values, limited government in which the citizenry retains its sovereignty, the privacy rights of minors, and restraining government intrusion into parental rights and fundamental decisions traditionally reserved for families – such as moral and religious education, value systems – and opposing the federalization of family law, among other issues. There is also a TFM PAC – a separate legal entity in which Gerald also participates. Gerald's involvement in these organizations is solely his – Diane has never had anything to do with either organization.

[9] Up to this point in time, Diane had never met James Trimm and did not know him.

Diane expresses surprise at Baca-Bennett's apparent endorsement of Munford as a candidate, since Diane believes that judges' supporting political candidates and publicly advocating political positions (except as an active candidate during an election campaign) violates the canons governing active judges. Baca-Bennett initially states she wants Munford to get an opponent or two, because he was not fit to be judge (she had practiced in his courtroom), but she just "doesn't like the name-calling."

Diane asked – if Baca-Bennett's desire to defend Munford was purely because he was a colleague and was not politically motivated – why had Baca-Bennett not come to Diane's defense when Diane was so vehemently attacked publicly over the *Leiliana Wright* case and even accused of "murder?" Diane further remarked that being called a "RINO" is better than being called a "Murderer" every time, or words to that effect.

Baca-Bennett demanded that Diane talk to Gerald – that TFM had to stop badgering Munford. Baca-Bennett reminded Diane that there was a connection to Diane's employment status ("I'm trying to wrap my head around the fact that you guys [the Associate Judges] technically work for me."). Diane gave her Gerald's private phone number and informed her she would need to talk to someone with influence at TFM, but that was not Diane. Diane is not active on any type of social media – not even the TCGOP EC discussion page,[10] no Facebook page – and she had no influence over TFM. She had only one conversation with Jim Trimm (the author of the Munford/RINO piece), and it had nothing to do with Munford, TFM or Baca-Bennett.

### October 25, 2017 (Wednesday):

Baca-Bennett texts Diane: "Jim wants to meet with you[,] with Matt and/or me present. He does not want cell phones. Are you interested? He wants to make peace and deal with hurts and misunderstandings." (Exhibit 2).

Diane replies: "When you have time, give me a call about this. Gerald was going to call you or return your call, I don't know which. I prefer a personal visit." (Exhibit 2). In person, Diane tells Baca-Bennett she will consider and pray over Munford's request for the next few days.

This gives Diane legitimate reason to believe there will be a resolution with the Munfords about the false and fraudulent accusations Terry Munford made about her.

---

[10] The Tarrant County Republican Party Executive Committee had created a Facebook page for precinct chairs and other party officials to communicate. Even though Diane was a precinct chair for decades, she had never used even that Facebook page.

**October 27, 2017 (Friday):**

Terry Munford ("Terry") approaches Diane's sister (Charla Brotherton) at a TFRW (Texas Federation of Republican Women) convention (in Dallas), where Diane has been nominated and is running for Vice President.  Terry seeks Brotherton's assistance regarding Terry's relationship with Diane.  Brotherton is direct with Terry with her defamatory remarks about Diane from the previous April (which the Haddocks had not discovered until much later). Terry does not deny making them, states she is "sorry" and that a conversation had "gotten out of hand," acknowledges the previous agreements by Ownby and the need to make it right, but states that things have just "fallen through the cracks."

**October 28, 2017 (Saturday):**

Diane follows up with Baca-Bennett via text: "Judge Bennett, in answer to your question last week [three days before] if I would meet with you/Matt and Judge Munford (without cell phones per JM request); as I said I would do, I have prayed about it and my answer is yes.  I will be happy to meet JM with anyone he chooses, with all the cell phones or cameras he wants to bring. I will be alone and will not bring a cell or any recording device (pursuant to his initial request).  I'm available any time." (Exhibit 3, p. 1).

Baca-Bennett replies with "OK. Let me ask him."  (Exhibit 3, p. 2).

**October 29, 2017 (Sunday):**

Bennett texts Diane and asks if she is working on Sunday – presumably to follow up.  (Exhibit 4).  Even though Diane is working Sunday afternoon, she does not see the text until the next day – Monday, October 30.

**October 30, 2017: (Monday):**

Diane replies to the previous day's text: "Yes ma'am but I went to church first so as not to be breaking one of the commandments.  I usually always work on Sunday to be organized for the week.  It's quiet and I can focus better." (Exhibit 4).

**October 31, 2017: (Tuesday):**

Baca-Bennett texts Diane at 6:43 a.m.: "Come see me if you have time."

Diane responds: "I'm meeting for Bible study before work.  Give me a call if you want to meet up after you get a bite at lunch.  I have a noon conference call with a Judge then I'll be in the lunchroom and after in the court all day."  (Exhibit 5).

Later, when the two have trouble arranging a meeting, Diane volunteers by text: "I do hope you told Jim that I was willing to visit with him, if he wanted.  I didn't

think it appropriate for me to respond to him directly since his request was made through you…"  (Exhibit 5, p. 3).

Baca-Bennett responds: "Jim told me he wanted to visit last week.  You weren't sure.  Then the attack piece written by James Trimm and shared by your husband.[11] Jim was hurt…I feel you and Jim want peace…I don't understand the article attacking Terry.  It alleges she said you took a bribe…She wouldn't say it and you wouldn't do it." (Exhibit 5, p. 4).

Diane: "I sure do [want peace].  But, the attack has been on me…Clakley's family has threatened a personal suit against me on that and other remarks.  Gerald tried to get it handled in July, Aug, and Sept through Jim and Craig.  What else can we do?  We didn't go looking for this evidence.  If Jim truly wants peace then he should come to me and doesn't have to trouble you." (Exhibit 5, pp. 5-6).

Baca-Bennett replied that she was leaving early for Trick-or-Treating with her kids, and Diane encouraged her to enjoy that time. (Exhibit 5, p. 7).

**November 7, 2017:**

Despite her lifelong dream of being a judge, Diane makes the agonizing choice to withdraw her declaration to run for judge.  Among those aware of or consulted on this important and life-changing decision were Tom Vick, a family lawyer and President of the State Bar of Texas (a personal friend of Diane's and Gerald's), Judge Harris, and others.  Vick, Harris, and everyone who knew her understood what a heartbreaking disappointment this far-reaching and impactful decision was for Diane – a milestone in her life.

**Early December, 2017 – mid-February, 2018:**

Nothing of significance is spoken between Baca-Bennett, Harris and/or Diane on the specific subject of Gerald's active political support of judicial candidate Jennifer Moore, who continues to run against Munford in the primary for the 322nd.  Gerald, James Trimm, Moore and many others continue to speak out publicly on a number of important political issues potentially affecting that race (and common in today's political climate), including:

- whether Munford has been violating Second Amendment rights by signing family court orders seizing or requiring surrender of guns without any evidence of violence or danger;
- whether Munford abused and sexually assaulted his first wife, Denia Mendenhall;[12]

---

[11] The existence and substance of an eye-witness Affidavit finally attributing the "bribe" rumor to Terry Munford had been published on the internet by James Trimm.

[12] It was actually Mendenhall herself who first made this claim publicly in September of 2017 on Gavelbanger: "In the mid 70's I was married to Jim Munford.  He was a viscous [sic] abuser and I wound up divorcing him. That he ever became a judge is that I failed, out of fear, to report him to the police."  As early as the late 90's, Mendenhall had been a public speaker to a group of nearly 100 police cadets about her abuse experience.

- Munford's current wife Terry's close friend Chris Arrington's claim that Terry had told him she was terrified of Munford.[13]

Both Harris and Baca-Bennett continue to be active campaigners for Munford on Facebook throughout the months leading up to the judicial primary (Baca-Bennett more than Harris). Both are extremely vocal against Gerald's political activity.

With the March 6, 2018, election primary approaching and Jim Munford's race continuing to heat up, Gerald's opposition to Munford's candidacy and his participation in the effort against Munford was no secret.

At some point during this time period, in an obvious attempt to persuade Gerald to stop his political activity and a blatant threat on Diane's job, Baca-Bennett communicates directly to Gerald that he has forgotten who Diane works for, or words to that effect.

It is also quite telling that Baca-Bennett's attempts to manipulate Diane do not merely resurface – they now morph into outright hostility against both Diane and Gerald, including false public claims that Diane was "resigning," and open threats to have her fired – both behind closed doors and, with participation by Judge Harris, on social media:

**February 20, 2018:**

Some time in February of 2018, a web site was created called https://geraldhaddock.com.  Despite the fact that the web site uses Gerald's name in the domain address (URL), the site was created without the Haddocks' knowledge or permission – a practice known as cyber-squatting.  The site was created for the sole purpose of defaming and demeaning both Diane and Gerald. Among other derogatory remarks about the Haddocks, the site stated:

> "They give money to help manipulate political races in Tarrant County."
> "[They have] been spreading lies about Tarrant County political candidates in an effort to flex their muscle and intimidate members of the local Republican Party."
> "If you have any dirt on Judge Diane Haddock or her husband, Gerald Haddock, email… [e-mail address provided]"
> Diane is referred to as "Chicken Lips," among other derogatory terms, and unflattering photoshopped pictures portraying Diane in a grotesque manner are posted on the site.

---

[13] This stemmed from an allegation by Arrington that Munford had caught Terry and Arrington in a car together and approached them with a gun, Arrington pulled his car away and ran over Munford's foot, breaking Munford's foot, but Munford told everyone he had run over his own foot.

Gerald and Diane later discovered that the "cybersquatter"[14] responsible for the creation and operation of this web site was a Fort Worth family lawyer who regularly practices in Tarrant County family courts. When the cybersquatting lawyer was criminally investigated and charged for operating this web site, he was defended by another Fort Worth family lawyer who regularly practices in Tarrant County family courts.

**February 21, 2018:**

A link to this offensive, illegal and derogatory website is posted in a Facebook group called Tarrant County Lawyers by a lawyer named Terry S. Daffron, a family lawyer who regularly appears in Tarrant County family courts, with the comment "The plot regarding all the crazy BS in the family law courts thickens…appears someone struck back….Has anyone else seen this website?"[15] It is "liked" or given a "wow" emoji by fourteen lawyers, including former District Judge Paul Enlow, as well as eight comments by other lawyers who regularly appear in Tarrant County family courts – most notably, lawyer David Wynne writes, "I love it." *While there is currently no evidence that any of the district judges or any Tarrant County representatives created this website, Baca-Bennett's previously expressed opposition to "name-calling" is conspicuously absent here.* ***Baca-Bennett also appears at a later time (see below) to supply this smear campaign website with fodder against the Haddocks.***

**February 24, 2018:**

Baca-Bennett posts her public endorsement and defense of Munford on Facebook. In follow up posts and comments, she continues to document her distaste for Gerald's politics, that she considers it connected to Diane's employment, and that she and Judge Harris are now discussing both behind Diane's back:

> "It isn't just her it is the millionaire wanting to control the family courts in Tarrant County." (Exhibit 6).
> …
> "Gerald Haddock gave $30,000 to the gun PAC that sent the other mailer." (Exhibit 7).
> …
> "Gerald Haddock is the husband of Associate Judge Diane Haddock. Her Judge Bill Harris agrees these ads are deceitful." (Exhibit 7).

**February 26, 2018 (Monday):**

Pam Flowers comes to the courthouse seeking large items to hang at the Haddock loft (Gerald and Diane were living temporarily in a downtown loft and were

---

[14] "Cybersquatting" is the practice of registering internet domain names that use or incorporate well-known company or brand names, or the names of famous or reasonably well-known people, in hopes of later reselling them for a profit. In this case, the cybersquatting family lawyer had offered to sell https://geraldhaddock.com for $1 million.

[15] (Exhibit 23).

expecting visitors on March 1, and the loft looked unfinished. Pam marked seven framed flags belonging to Diane, as well as Diane's race frames.  Diane called Pam and she had three more flags, and Pam said to bring them all.  With the help of the bailiffs assigned to the 233rd (Hess and Gonzalez), Diane loaded all 10 flags in the car. Everyone knew this was temporary and for a home decorating project.

## February 27, 2018 (Tuesday):

With the help of the 233rd staff, Diane loaded her race frames.  While they were loading, Judge Harris asked what they were doing. When Diane told him that she needed some large art for the loft, Harris helped out by holding the door. Everyone in the court knew that Diane had moved the flags and why.  Sergeant Waits (who supervises all of the bailiffs in the Tarrant County Family Law Center) asked Gonzales after hours if Diane was retiring and stated he had heard a rumor since she was moving the flags.  Gonzales quickly set Waits straight that the Haddocks had moved temporarily into the loft and needed filler art.

## February 28, 2018 (Wednesday):

After the frames and flags were hung in the loft, Diane had taken photos – she brings them to work and shows everyone at the office.  It was obvious by this point to everyone at the courthouse who knew Diane why Diane's flags and racing frames had been temporarily moved.

Later, at 6:00 p.m., Diane meets with former Associate Judge Lisa Beebe (who was serving as a visiting judge in 325th) after work. During their conversation, Beebe informs Diane that Baca-Bennett had summoned Beebe under the ruse of consulting with her about a case. After a short question and response, Baca-Bennett's real purpose was revealed:  Baca-Bennett told Beebe that as Diane's friend she needed to tell Diane to "get her husband under control" or "handle her husband," or words to that effect – clearly in reference to Gerald's opposition to Munford's campaign. Beebe rebuffed this request by saying Diane would do no such thing, and that Beebe had too much respect for Diane to even suggest it.

## March 1, 2018 (Thursday):

Diane ran into former district judge Mike Sinha in the parking garage. Since leaving office, Sinha has regularly served as a visiting Associate Judge. Sinha told Diane he was sorry for what she was going through, and he asked how she was holding up and what she was planning to do.  When Diane asked what he was talking about, Sinha indicated he had heard Baca-Bennett was trying to convene a meeting of the district judges to fire Diane.

President of the State Bar of Texas (Tom Vick) – with whom the Haddocks had previously had numerous discussions over the years about how much Diane loved being an Associate Judge and was making sure she was prepared if the opportunity

to run for an elected judicial position ever presented itself – sends an E-mail to all State Bar members, including Diane and Gerald separately, about an upcoming State Bar initiative called "Texas Day of Civility in the Law." (Exhibit 8).

Gerald, without Diane's knowledge, sends a private reply directly to Vick (and *only* to Vick) saying, "why didn't we have a day of civility when Diane was being accused of murder?"  Both men knew this was a reference to the publicity over the *Leiliani Wright* case.  Gerald also says that Diane "is now giving up being a judge and may be the best one over there."  *Both men (and anyone who knew the history of Diane's judicial campaign) knew this private communication between Gerald and Vick was a reference to Diane's having removed her name from consideration as a judicial candidate, and nothing else.* (Exhibit 8).

### March 2, 2018 (Friday):

Visiting judge Mike Sinha came to Diane's courtroom through the back entrance in the late afternoon.  The courtroom was empty except for Diane and her bailiff, Gonzalez.  Sinha gave Diane a big hug and told her that he was really sorry for what Baca-Bennett was doing to Diane.  He stated that he had been made aware by other district judges that Baca-Bennett was trying to marshal enough votes to fire her –*specifically because of her husband's campaigning against Munford in the primary.*  Mark Lane drops in about that time because he "heard she was leaving" and wanted to catch her before she left – evidence that Baca-Bennett was fueling this rumor will be discussed below.

### March 3, 2018 (Saturday):

Diane notices a text from Cindy Mendoza (which had come in around 11 p.m. the night before) saying: "What happened today [Friday] with you at the courthouse?"  Diane calls her bailiff (Gonzales) around 8 a.m. and asks him if anything happened after she left on Friday – he says no.  Diane then speaks with Mendoza on the phone, who informs Diane that *Baca-Bennett has been telling people at the courthouse that Diane cleaned out her office and quit while Judge Harris was not there.*

That evening, Judge Harris contacts the court staff (approximately 7:30 p.m.) asking "what the hell is going on with Diane," and asking if they knew whether Diane had resigned.  Although Plaintiff has not yet obtained a copy of that text, she believes the court staff will all confirm it was sent. All members of the 233rd staff respond that everything was fine with Diane, and that the last statement made by her on Friday, March 2, 2018 was "have a great weekend and I will see you on Monday."  Each member of the court staff Harris contacts gives that same response.

Despite having heard from court staff that Diane had not resigned, Harris takes it upon himself to announce on social media that she has.  In an attempt to bolster his claim, Harris writes on his Facebook page:  "Tom Vick *in his capacity as the President of the State Bar of Texas* ... informs me that by an e-mail, Gerald Haddock

has announced his wife's resignation as the Associate Judge of the 233rd. I have not heard one word from Diane, but Gerald's communication to Tom seems to speak volumes, yes?" (Exhibit 9) (Emphasis added).

**March 4, 2018 (Sunday):**

Diane learns of Harris's Facebook post via a forwarded screenshot from Cindy Mendoza (received by Diane a little after midnight). She is shocked and panicked, and she wakes up Gerald from a deep sleep. Diane immediately calls Harris and sends him a text about his post. (Exhibit 10). Diane also calls Vick and sends him a text (Exhibit 11), asking Vick to call her and tell her what he said to Bill Harris to make Harris think she had resigned.

At this time, Gerald cannot fathom anything he has sent to Vick that could have been construed as resigning Diane's employment, and he initially comments on Harris's Facebook post that his E-mail account may have been "hacked."

Through the wee hours of the morning, Gerald continues to review the situation, searches his E-mails, finds the E-mail to Vick, realizes what happened, and sends E-mails to Harris and Vick (Exhibit 12), denying that he had ever purported to resign Diane's position for her. Gerald then posts on the Harris Facebook page what actually happened. Gerald categorically denies that he ever announced Diane's resignation. (Exhibit 9, pp. 3-4; 13-18).

At 9:42 a.m., Tom Vick calls Diane and Gerald and is dumbfounded – he simply cannot believe Harris attributed such remarks to him. He denies telling Harris that Gerald had announced Diane's resignation. Vick explains that Harris had called him and asked about an E-mail from Gerald, that he (Vick) found the E-mail and read it to Harris verbatim (Exhibit 13). Vick assures Diane he never speculated to Harris about the meaning of Gerald's E-mail, and he agrees with the Haddocks that nothing in Gerald's private E-mail to Vick even remotely suggests that Gerald was offering Diane's resignation. Vick promises to post the clarification on Harris's Facebook page as soon as he can get to his computer. Diane asks, since she is not active on Facebook, if Vick will send his statement to her via E-mail; however, to her disappointment she does not receive anything further from Vick on that day.

Around 10:02 a.m., Diane receives a phone call from Harris in response to her request that he call her about his post. Harris claims Vick called him (which Vick had just denied). Harris states he is glad Diane contacted him, and that as far as he is concerned, she is the Associate Judge of the 233rd until she decides otherwise. Diane asks why he had made the post without contacting her. Harris claims he tried

to reach her, but Diane knows she has not received any phone calls or messages from him.[16]

Although Harris deletes his Facebook post about Diane's "resignation" around noon (and all the comments and posts replying to him and to other replies), and although he did make a follow up post (Exhibit 13), Harris never came out and acknowledged his error in judgment or the harm it caused Diane.  Harris never explained the inconsistencies between his own account and Vick's account, which are demonstrated by the following side-by-side comparison of Harris's and Vick's posts:

| **Harris**[17] | **Vick**[18] |
| --- | --- |
| "Tom Vick…*calls me* last night" | "I noticed my phone had been ringing and *I had missed a call from* Judge Harris" |
| "*in his capacity as President* of the State Bar" | "*Neither I nor the State Bar has any authority or jurisdiction* over the District Court, its judges or employees." |
| | "*nothing* to be done with this E-mail *in my official capacity* or otherwise" |
| "*informs me* that by an e-mail Gerald Haddock has announced his wife's resignation" | "*he related that he heard* I had received an E-mail from Gerald Haddock" |
| "I have not heard one word from Diane, but Gerald's communication to Tom seems to *Speak volume, yes?*" | "*the question appeared to be rhetorical in nature*. I did not forward it because there was no content that would suggest it should have been" |

Harris also never apologizes to Diane for what his previous public post started, or the degree to which it exacerbated and appeared to encourage, give credence and credibility to, and support, the separate, malicious attacks against Diane by Baca Bennett – both around the courthouse and on Facebook.

Baca-Bennett also makes numerous false or misleading posts and comments about Diane's "resignation," embellishing the story significantly:

---

[16] Diane did receive a random E-mail on Saturday morning, which Harris apparently sent at 9:03 p.m. on Friday, March 2, 2018, but it was nothing more than a link to YouTube (Exhibit 14).  Believing it to be Spam, she had deleted it.  That was the only communication she received from Harris.  Significantly, Harris has Diane's mobile phone number and E-mail, her home number and the contact information for every member of her family.
[17] Exhibit 9.
[18] Exhibit 13.

> "Associate Judge Diane Haddock started moving her framed flags and art out of the Courthouse Wednesday fueling rumors that she was going to resign.  Then a strange email was allegedly sent by Gerald Haddock to the president of the State Bar of Texas.  The email was rumored to have said that due [to] corruption in the election process [his] wife is resigning…No one bothered to talk to Bill Harris, her supervising.  The State Bar President was put in the awkward position of telling him."  (Exhibit 16).

Baca-Bennett leaves this gross misrepresentation and the responsive comments posted and public, long after becoming aware of Harris's retraction and Vick's clarification.   Baca-Bennett's comments continue to interfere with Diane's employment and demeaned Diane's marriage and family relationships to all who read them.

Baca-Bennett's continued posting not only incites the public and Diane's fellow judges, it also undermined Diane's authority as a judge, since many of the lawyers she incited to trash Diane publicly are lawyers who regularly appear in Diane's courtroom before her. (Exhibit 16).  One of them – Paul Enlow – ("I think Judge Harris should just accept that E-mail resignation and end this craziness") is even a former judge, adding more credence to both the false "resignation" story and undermining Diane's authority as an Associate Judge.  (Exhibit 16).

Baca-Bennett continued her hostile and public diatribes against Diane long after Vick's post (Exhibit 13) verified both Gerald's and Diane's version of the events.

**<u>March 5, 2018:</u>**

Diane hears separately from three prominent Republican women (including at least one from out of state) that each had heard Diane "cleaned out her office in the dark of night and quit without any notice."  Attached to this Complaint as Exhibits 17 through 18 are pictures of Diane's office as it existed throughout the month of March, 2018, and as it still exists today.  No reasonable person could ever have believed Diane had resigned, quit, or cleaned out her office; nor could any reasonable person have believed that she was not fully committed to the daily business of the Tarrant County Family Courts and administering justice.

Baca-Bennett's and Harris's social media campaigns against Diane continue to serve as fodder for various web sites defaming both Diane and Gerald.  The web sites simply post screenshots or quotes from Baca-Bennett's and Harris's posts:

This same day (March 5, 2018), the website https://geraldhaddock.com posts an article slamming James Trimm.  In this article, a screenshot is posted of an old Facebook post by Gerald Haddock.  ***Significantly, the screenshot or picture appears to have been taken while viewing the post from Patricia Baca-Bennett's Facebook account, since the name "Patricia" appears at the top of the picture as***

*the person logged into Facebook!  In other words, Baca-Bennett supplied content to the smear campaign website in response to its requests for "dirt" on the Haddocks!* (Exhibit 19).

### March 6, 2018 (Tuesday – Daytime):

Diane reports the majority of the facts above to Tarrant County and advises Tarrant County that she is experiencing a hostile work environment based on the political retaliation from Baca-Bennett.  Upon information and belief, Tarrant County takes no action, and the retaliatory action continues.

### March 6, 2018 (Tuesday – Nighttime):

The night of the primary election, Diane receives a text from Charla Moore, a lawyer who regularly practices in Diane's court:

> "I guess you will be happy with the results of the race you and Gerald manipulated.  Good luck with Kenneth in the all the years ahead, since you are not, would not and did not resign!!" (Exhibit 20).

It is highly unusual and inappropriate for a lawyer to send this kind of text to a judge before whom she regularly appears.  Moore's text, however, was clearly emboldened by (and even tracks a great deal of the language and flow) Baca-Bennett's and Harris's Facebook posts.  This is simply further evidence of the degree to which Baca-Bennett's and Harris's public negative remarks about Diane undermine respect for her judicial authority.

### March 8, 2018 (Thursday):

Baca-Bennett's hatred and opposition to Gerald's politics are now so blatant and unabashed, she even attacks both Gerald and Diane from the bench, in open court, during unrelated court business, when neither of them is present:

A lawyer named Patrick Dooley goes door to door to get a show cause order signed (an uncontested order any judge can sign).  He sees Baca-Bennett is in – in her judge's robe and on the bench – and asks if she is available to sign a show cause order.  While she is looking over Dooley's file, Baca-Bennett says something to the effect of: "I heard something about you representing Gerald Haddock – tell me that's not true" [Dooley was handling some legal work for Gerald unrelated to the show cause order Baca-Bennett was considering in open court while making these remarks].

As Dooley attempts to reply that it is true, Baca-Bennett (still from her seat on the bench) asks if Gerald is "insane or delusional."  She starts claiming that Gerald spent $300,000 "to smear Judge Munford," and that Gerald "attempted to hide the money through a PAC but didn't do a good job."

*Baca-Bennett then asked Dooley (still from the bench in open court) "why Judge Haddock would not resign"* and proceeded to tell Dooley that Judge Harris had posted on Facebook that Diane had resigned through her husband's E-mailing Tom Vick.

She then asked Dooley how he could work for Gerald Haddock, who she claimed was "an evil man" and "a bully."  (Exhibit 21; the statement of Patrick Dooley is provided in both his own handwritten form and a typewritten version).

### Mid-April 2018:

Baca-Bennett instructs another Tarrant County employee (who happens to have been Diane's friend for twenty-five years [25]) that the employee can no longer speak to Diane.  This employee is counting her days to retirement and cannot afford to lose her job, so she is afraid to stand up to Baca-Bennett.

### April 5, 2018:

Baca-Bennett openly posts on Facebook that she and other district judges have struck an apparent pact that they will simply disregard Texas Family Code 201.004(b), which states:

> "The employment of an associate judge who serves more than two courts [as Diane does] may only be terminated by a majority vote of all the judges of the courts which the associate judge serves." (Exhibit 22).

Baca-Bennett then pontificates that her authority is superior to that of the Tarrant County Commissioners, all other district judges, the Texas Legislature, and the United States Constitution: "It is my opinion, that I, and I alone may determine who sits as the Associate Judge of the 360th and who receives that salary.  The only signature that has any legal meaning on the Order of Appointment is my signature." (Exhibit 22).  In the context of her previous public posts and private lobbying about Diane's termination, it is clear this post is yet another attempt to drudge up support for Baca-Bennett's ongoing campaign to have Diane fired.

### April 26, 2018:

Kenneth Newell, who has just recently won the Republican primary, has no general election opponent and will therefore be the District Judge of the 233rd beginning in January of 2019, drops by to see Diane without an appointment.  Newell informs Diane he has read posts indicating that Diane has resigned. Newell states that he wants to hear from Diane herself. Diane tells Newell that she did not resign and would never abandon her post in the unprofessional way that Harris and Baca-Bennett posted on social media. Newell then began asking questions solely about Diane's retirement: "Is 20 years a magic number for Tarrant County employees" or words to that effect. Newell was keenly aware that Diane would have reached the

20 year mark the same month that he became the Presiding Judge in the 233rd (and Diane's supervisor), and he gave Diane the impression that he assumed she would be retiring.

He indicates that people are asking him every day what he is going to do about Diane but states, "I want to be clear – I have not made a decision about what to do with you," or words to that effect.  He also indicates he has seen Baca-Bennett's public posts about the associate judges' statute, which he professes is unclear. Diane assures him she would never abandon her post without notice and opportunity for a smooth transition.  Newell acknowledges that Diane is the most qualified for the position but states again, "I just don't know what I am going to do with you." This conversation leaves Diane with the very clear impression that Newell has, in fact, made a decision to terminate her but does not want to do it himself.  He leaves Diane with the impression that she would be difficult to keep despite her qualifications due to the political situation, part of which he witnessed on social media.

**<u>March – May, 2018:</u>**

During this time frame (exact dates currently unknown), Diane overhears Harris encouraging lawyers to apply to Newell to be his Associate Judge (replacing Diane).  To Diane's face Harris states, "we are hoping that John Clark will replace you," as if it is already a foregone conclusion that Diane is leaving, even though she has never given any such indication. This statement indicated to Diane that "we" meant Harris, Newell, Baca-Bennett and perhaps other judges and lawyers.

At some point, upon information and belief also during this time frame, Diane learns that Baca-Bennett, in the Family Law Center, was overheard in the lawyers lounge screaming, yelling and crying while demanding support to oust Diane.

**<u>May 18, 2018:</u>**

After repeated cries by Diane to Tarrant County for protection, and Tarrant County's failure to act, Diane has no choice but to hire a lawyer who, via detailed letter, informs Defendant Tarrant County that the hostile work environment and political retaliation are continuing.  Upon information and belief, while Tarrant County requests additional time to investigate, it takes no action and, in fact, ultimately denies any responsibility for protecting Diane – its employee.

11. In short, Baca-Bennett's interference with Diane's nearly 20-year working relationship with Tarrant County is nothing more than a blatant attempt to silence Diane's husband by retaliating against Diane, by impugning Diane's reputation as a judge, and injuring Diane by preventing her from working until the age of sixty-five (65) [Diane's planned retirement age],

which would also deprive Diane of retirement benefits she would otherwise have earned.  It is neither legal nor ethical for any Tarrant County employee or supervising judge to discuss Diane's employment publicly.

12. The Facebook posts about Diane from her supervisors and employers were disheartening and physically debilitating.  She sought counseling and began taking heart medication to deal with the constant sabotage.  The badgering, threats, back-biting, undermining and public maligning (primarily by Baca-Bennett but with help from Harris) have created a hostile work environment for Diane – in retaliation against Diane for:

> a)  Diane's having refused to advocate positions or patronize the same judicial candidate Baca-Bennett supports (Munford);
> b)  Diane's having refused to "get her husband under control" and stop him from supporting Munford's opponent in the election primary; and
> c)  Diane's having refused to "get her husband under control" and stop him from engaging in and supporting political speech advocating for the Second Amendment and questioning Munford's fitness for office and judicial temperament.

The behavior of Baca-Bennett and Harris violated Tarrant County's policies regarding commenting on social media about Diane's employment status with Tarrant County.

13. In short, Diane had not resigned and would never have left her post in such an unprofessional way. To post otherwise was not only false and spurious, it was also embarrassing and abusive.  It was also illegal, unethical and unprofessional conduct.  Moreover, the active maligning and campaigning against Diane within the courthouse walls by Baca-Bennett, as well as her Facebook posts, have created a hostile work environment for Diane.

14. Although (upon information and belief) Baca-Bennett was cautioned about her conduct by other judges, Baca-Bennett nonetheless continued to badger and slander Diane on her Facebook page, to the point that Diane now lives in fear of continued retaliation.  After PBB harassed Diane

on social media, then terrorized her at the courthouse in the lawyer's lounge and beyond, Diane ceased going to work on weekends where she would be unprotected, and during the work week, Diane is now never outside the presence of her bailiff.

15. Diane loves her job and had always hoped to continue working for Tarrant County until retirement – she has never once considered resignation prior to these events. The illegal, unethical and retaliatory conduct by Baca-Bennett, however, coupled with the public comments by Harris (however inadvertent their effect may have been), creates a hostile work environment that actively undermines her and threatens Diane's ability to serve Tarrant County effectively through her originally anticipated retirement date of January, 2022. These events have given Diane no choice but to evaluate her options, including, unfortunately, having to contemplate litigation against Tarrant County – an employer she loves and has served for two decades – for violations of her First Amendment rights and its failure to provide her a safe, hostile-free work environment.

## CAUSES OF ACTION

### A. Public Employees are Protected from Retaliation for Speech

16. The First Amendment of the Constitution of the United States guarantees every citizen the right to freedom of speech, which includes the right to engage in political activities, to campaign and run for public office, and to associate with an individual exercising that individual's right to freedom of speech.

17. In most circumstances, disciplining, discharging or otherwise retaliating against a public employee because of the employee's speech (or other form of expression) is unlawful retaliation for having exercised First Amendment rights, which is legally actionable under 42 U.S.C. §1983, *et seq.* In general, in order to prevail on a free speech retaliation claim, a public employee need only establish that:

(1) he/she was <u>not</u> speaking pursuant to his/her official job duties;

(2) he/she was speaking as a citizen on a matter of public concern;

(3) the employee's interest in speaking outweighed the employer's interest (if applicable) in promoting workplace efficiency;

(4) he/she suffered an adverse employment action; and

(5) the adverse action was substantially motivated by the protected speech.

See, *e.g., **Burnside v. Kaelin**,* **773 F.3d 624, 626 (5th Cir. 2014)** *Hurst v. Lee Cnty., Miss.,* **764 F.3d 480, 484 (5th Cir. 2014), cert. denied, 135 S. Ct. 1179 (2015)**; see also, ***Juarez v. Aguilar***, **666 F.3d 325, 332 (5th Cir. 2011)**.

### B.  Public Employees are Protected from Retaliation for Political Patronage (or Lack Thereof)

18. The First Amendment not only protects speech, it also prohibits government officials from dismissing, demoting, or otherwise retaliating against an employee because of the employee's engagement in constitutionally protected political activity. ***Elrod v. Burns***, **427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976)**. Even if the employee has not engaged in any protected activity, if the employer mistakenly believes the employee has and retaliates, that is also a violation of the employee's right against retaliation.  ***Heffernan v. City of Patterson***, **136 S.Ct. 1412, 1416 (2016)**. When an employer fires an employee out of a desire to prevent the employee from engaging in political activity that the First Amendment protects, the employee is entitled to challenge that action even if the employer makes a factual mistake about the employee's behavior. ***Id.***, **at 1418**.

19. Nor can government employers argue that the employee was not politically active overtly, or that she did not publicly support candidates or actually speak on issues.  First, actual active support of a political group is not required in order to guarantee First Amendment protections. ***Welch v. Ciampa***, **542 F.3d 927 (1st Cir.2008)**. In Welch, the plaintiff produced

evidence that persons who did not support a recall election were perceived as opposing it. *Id.* at

939. Whether the plaintiff *actually* affiliated himself with the anti-recall camp was not dispositive

in *Welch*, because the pro-recall camp attributed that affiliation to him. *Id.*  Put another way, *Welch*

demonstrates that *refusing political patronage to an issue or candidate has the same protection as*

*unpopular political patronage.*

### C.  Public Employees are Protected from Retaliation
### In Response to Actions by Their Family Members

20. The Fifth Circuit has recognized First Amendment free association claims for "intimate

human relationships" such as marriages, children, and living with relatives. *Caleb v. Grief*, **598**

**Fed.Appx.227, 237 (5th Cir.2015)**. The elements are: (1) an adverse employment action such as

a termination;[19] (2) the interest in associating outweighs the employer's interest in efficiency; and

(3) the protected activity was a substantial or motivating factor in the adverse employment action.

*Id.*  Adverse action by government officials violates the First Amendment right to free association.

As stated by the United States Supreme Court:

> "The Court has long recognized that, because the Bill of Rights is designed to
> secure individual liberty, it must afford the formation and preservation of certain
> kinds of highly personal relationships a substantial measure of sanctuary from
> unjustified interference by the State....The personal affiliations that exemplify these
> considerations, and that therefore suggest some relevant limitations on the
> relationships that might be entitled to this sort of constitutional protection, are those
> that attend the creation and sustenance of a family—marriage...childbirth... the
> raising and education of children...and cohabitation with one's relatives."

*Roberts v. United States Jaycees*, **468 U.S. 609, 619 (1984)**.  Therefore, the right of intimate

association extends to the husband-wife relationship, and a government official violates the first

amendment right to free association by retaliating against an employee because of her husband's

---

[19] Or a hostile work environment – see the *Clancey* case, below

political activities. *See* **Sutton v. Village of Valley Stream, 96 F. Supp.2d 189, 192-93 (E.D.N.Y.2000);** *See also* **Patel v. Searles, 305 F.3d 130, 136 (2nd Cir.2002)**.

21. This First Amendment principle against retaliation for free association has long been recognized by the Fifth Circuit. In **Wallace v. Texas Tech. Univ.**, 80 F.3d. 1042, 1051 (5th Cir.1996), the Fifth Circuit noted that the Supreme Court has recognized that the First Amendment protects a right of association and choice to enter into and maintain certain intimate human relationships and that they are protected as an element of personal liberty. **Wallace, 80 F.3d. at 1051.** The Fifth Circuit repeated this statement in **Caleb v. Grier, 598 Fed.App. 227, 237 (5th Cir.2015)**, when it cited the Supreme Court for the proposition that these protected relationships include marriage, children, child rearing and cohabitation with relatives. **Grier, 598 Fed.App. at 237.** The types of associations protected under the First Amendment are "relationships that presuppose deep attachments and commitments to the necessarily few individuals with whom one shares not only special communicants of thoughts, experiences, and beliefs, but also distinctively personal aspects of one's life." *Id.* [citing *Wallace*]. Given this precedent, it is clear that Diane's constitutional right not only to associate with her husband, but also to be free from retaliation because of his speech or political activity, or because she will not intervene against him, has been violated.[20]  Baca-Bennett put Diane in an untenable position – "disassociate (divorce) from your husband or lose your job."

---

[20] Employees are not limited to pursuing §1983 solely against their government employers.  They may also join other individual actors who are public officials, and they may assert conspiracy claims under §1983. **Mizell v. North Broward Hosp. Dist., 427 F.2d 468, 472-73 (5th Cir.1970)**. The Fifth Circuit has recognized that section 1983 plaintiffs may assert a conspiracy claim. **Owens v. Board of Regents of Texas Southern University, 953 F.Supp. 781, 791(S.D.Tex.1996)**. A plaintiff need only establish (1) the existence of a conspiracy involving state action and (2) a deprivation of civil rights in furtherance of the conspiracy. *Id.*

### D. Under a *Sibley* Analysis, Both Defendants Are Plaintiff's "Employers," and They Share an Obligation to Protect Plaintiff from Political Retaliation

22. Defendant Tarrant County functions as what is more traditionally recognized as Plaintiff's "employer" – it pays her salary, offers her health and life insurance, originally provided her with employee orientation, employee handbook, Tarrant County E-mail address, etc.  Defendant Tarrant County also provides facilities, technology, equipment and security.  Defendant Tarrant County delegates some of its administration and oversight of the Associates Judges to the District Judges – including Baca-Bennett – for which it compensates the District Judges.

23. Defendant Baca-Bennett, on the other hand, holds one of the votes necessary to terminate Plaintiff's appointment by majority; however, she must not use that vote to engage in political retaliation against Plaintiff.  While Defendant Baca-Bennett currently lacks the majority vote needed to terminate Plaintiff, Defendant must also not be permitted to accomplish though illegal means that which she has been unsuccessful at accomplishing through legal means – that is, retaliating against Plaintiff informally through a hostile work environment, hoping to make Plaintiff's professional and work life so miserable that Plaintiff will quit.

24. While an employer / employee relationship is not necessary for government entities and officials to be legally prohibited from engaging in political retaliation against a citizen, here both the Defendants share power, influence and control over Plaintiff's work environment and conditions, to the extent that both Defendants function as Plaintiff's "employer" under the analysis set forth in ***Sibley Memorial Hospital v. Wilson*, 488 F.2d 1338 (D.C. Cir. 1973)**; ***NME Hospitals, Inc., v. Rennels*, 994 S.W.2d 142 (Tex. 1999)** (applying the *Sibley* analysis to Texas employment relationships**).**

## <u>RELIEF REQUESTED</u>

The Plaintiff, **DIANE SCOTT HADDOCK**, asks that this Court enter a judgment:

(1) Declaring that the acts and practices complained of in this Complaint are in violation of federal law;

(2) Enjoining and permanently restraining Defendants from retaliating against the Plaintiff for engaging in activities protected by the First Amendment;

(3) Directing Defendants to pay the Plaintiff compensatory damages for the harm that she suffered, past and future, caused by this unlawful retaliation against her;

(4) Awarding Plaintiff pre-judgment interest on the amounts owed at the maximum rate allowed by law;

(5) Awarding the Plaintiff's costs of this action, together with reasonable attorneys' fees and expert witness fees;

(6) Awarding Plaintiff's post-judgment interest on the amount of the judgment until paid at the maximum rate allowed by law; and

(7) Awarding Plaintiff such other relief, legal or equitable, as may be warranted.


Respectfully submitted,

**THE HART LAW FIRM**

Walter L. Taylor
State Bar No. 19727030
***Wtaylor@thehartlawfirm.com***
6630 Colleyville Blvd, Suite 100
Colleyville, Texas 76034
Tel: (817) 329-7020
Fax: (512) 329-7021
**ATTORNEY FOR DIANE SCOTT HADDOCK**