# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

| | | |
|---|---|---|
| **DIANE SCOTT HADDOCK,** | § | |
| **Plaintiff** | § | |
| | § | |
| **VS.** | § | **A CIVIL ACTION 4:18-cv-00817-O** |
| | § | |
| **TARRANT COUNTY, TEXAS,** | § | |
| **PATRICIA BACA-BENNETT, in both her** | § | |
| **Individual and Official Capacities,** | § | |
| **KENNETH EARL NEWELL, in his** | § | |
| **Official Capacity only, JESUS "JESSE"** | § | |
| **NEVAREZ, JR., in his Official Capacity** | § | |
| **only, JUDITH WELLS, in her Official** | § | |
| **Capacity only, JEROME S. HENNIGAN,** | § | |
| **in his Official Capacity only, JAMES B.** | § | |
| **MUNFORD, in his Official Capacity only,** | § | |
| **and ALEX KIM, in his Official Capacity** | § | |
| **only,** | § | |
| **Defendants** | § | **A JURY IS DEMANDED** |

## PLAINTIFF'S RESPONSE TO DEFENDANT DISTRICT JUDGES' RULE 12(b)(1) AND RULE 12(b)(6) MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT [DOC. 38] AND BRIEF IN SUPPORT

### THE HART LAW FIRM

Walter L. Taylor
State Bar No. 19727030
*Wtaylor@thehartlawfirm.com*
6630 Colleyville Blvd, Suite 100
Colleyville, Texas 76034
Tel: (817) 329-7020
Fax: (682) 292-7406

**ATTORNEY FOR PLAINTIFF
DIANE SCOTT HADDOCK**

# Table of Contents

TABLE OF AUTHORITIES ..............................................................................................ii

I.  OVERVIEW OF RESPONSE ...............................................................................1

   A.  Summary of Diane's Claims: ...............................................................................1

   B.  Grounds for Denial of 12(b)(1) and 12(b)(6) Motions: ....................................3

II. ARGUMENTS AND AUTHORITIES.......................................................................3

   A.  The Eleventh Amendment does not bar Diane's claims. .....................................3

      1.  The Eleventh Amendment does not bar Diane's claims against the District Judges in their official capacities for the prospective injunctive relief of reinstatement or front pay in lieu of reinstatement. .......................................................................................................3

      2.  The Eleventh Amendment does not bar Diane's claims for compensatory damages against Baca-Bennett in her individual capacity. ......................................................................4

      3.  Standard of Review: ................................................................................................5

   B.  Diane has shown a violation of her First Amendment rights. ...............................5

      1.  Diane is a simply a public employee, not a policymaker or confidential employee. ...........6

      2.  Diane's hostile work environment was an adverse employment action and First Amendment retaliation under *Burlington N.* and its progeny. ......................................................12

      3.  Diane has offered far more than mere speculation or conjecture that her termination was First Amendment retaliation, either for Gerald's political activity of for filing this lawsuit.....15

   C.  Baca-Bennett is not entitled to a 12(b)(6) dismissal on qualified immunity ...........................21

      1.  Diane's First Amendment right was clearly established by *Elrod* and its progeny. ...........21

      2.  Baca-Bennett's own conduct outside her official duties demonstrates that she is not entitled to qualified immunity. .........................................................................................24

      3.  Baca-Bennett's request for prompt resolution of the qualified immunity defense prior to discovery appears to be moot. ........................................................................................26

III. CONCLUSION ...................................................................................................27

## __TABLE OF AUTHORITIES__

**Cases**

*Anderson v. Creighton*, 483 U.S. 635, 640 (1987)................................................................22

*Arthur H. Richland Co. v. Harper*, 302 F.2d 324, 325 (5th Cir. 1962)..................................5

*Atteberry v. Nocona Gen. Hosp.*, 430 F.3d 245, 256 (5th Cir 2005) ..............................22, 24

*Aucoin v. Haney*, 306 F.3d 268 (5th Cir. 2002) ...................................................................24

*Ballard v. Muskogee Reg'l Med. Ctr.*, 238 F.3d 1250, 1253 (10th Cir. 2001).........................4

*Boehms v. Crowell*, 139 F.3d 452, 458 (5th Cir. 1998) ........................................................16

*Bosque v. Starr Cty.*, 630 Fed. App'x 300, 305 (5th Cir. 2015) ...........................................16

*Brady v. Houston Indep. Sch. Dist.*, 113 F.3d 1419, 1424 (5th Cir. 1997)...........................16

*Burlington N & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)...................................13

*Charles v. Grief*, 522 F.3d 508, 511 (5th Cir. 2008)............................................................21

*Cicalese v. UTMB*, ---F.3d ----, 2019 WL 2127562, *4 (5th Cir., May 16, 2019)............5, 15

*Clancey v. City of College Station*, 2011 WL 335148 (S.D. Tex. 2011)...............................14

*Cornforth v. University of Oklahoma Bd. of Regents*, 263 F.3d 1129, 1133 (10th Cir. 2001).......................4

*Deloach v. Delchamps*, 897 F.2d 815, 822 (5th Cir.1990) .....................................................4

*Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333 (5th Cir. 2008)..........................................15

*Elrod v. Burns*, 427 U.S. 347, 96 S. Ct. 2673, 49 L.Ed.2d 547 (1976)............................passim

*Epps v. Oklahoma Board of County Commissioners, et. al.*, 2019 WL 209576, *1 (May 13, 2019)...........4

*Gary A. v. New Trier High School Dist. No. 203*, 796 F.2d 940, 945 (7th Cir. 1986). ................4

*Gee v Principi*, 289 F.3d 342, 346-347 (5th Cir.2002) .........................................................16

*Hafer v. Melo*, 502 U.S. 21, 30-31(1991) ............................................................................4

*Hutto v. Finney*, 437 U.S. 678, 692, 98 S. Ct. 2565, 2574, 57 L.Ed.2d 522 (1978) ...............4

*Jackson v. Georgia Dept. of Transp.*, 16 F.3d 1573 (11th Cir. 1994)......................................5

*Jakomas v. McFalls*, 229 F.Supp. 2d 412 (W.D. Penn. 2002)................................................9

*James v. Tex. Collin Cnty.*, 535 F.3d at 376 .......................................................................15

*Janus v. American Federation of State, County, and Municipal Employees, Council 31, et al.*, --- U.S.----, 138 S.Ct. 2448, 2463, 201 L.Ed.2d 924 (2018) .....................................................................6

*Johnson v. Johnson*, 385 F.3d 503, 529 (5th Cir. 2004) ........................................................5

*Jumbo v. Dolgencorp of Tex. Inc.*, No. 4:15-CV-1451, 2017 U.S. Dist. LEXIS 165502, at *32 (S.D. Tex. Sep. 30, 2017) ...............................................................................................................13

*Koppman v. South Cent. Bell Telephone Co.*, 1992 WL 280793 *4 (E.D.La. July 12, 1992) .....................4

*Kovacic v. Villarreal*, 628 F.3d 209 (5th Cir. 2010) .....................................................23, 24

*Laxton v. Gap Inc.*, 333 F.3d 572, 581 (5th Cir. 2003) ........................................................16

*Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009) ........................................5

*McClendon v. City of Columbia*, 305 F.3d 314 (5th Cir. 2002)........................................23, 24

*McCloud v. Testa*, 97 F.3d 1536, 1556 (6th Cir. 1996) .......................................................22

*McLaurin v. City of Jackson Fire Dep't*, 2006 U.S.App. Lexis 31274, 3-4 (5th Cir. 2006).....................13

*Montgomery County v. Park*, 242 S.W.3d 610, 614-15 (Tex. 2007) .....................................13

*Mooney v. Lafayette County School Dist.*, 528 Fed.App'x. 447, 456-57 (5th Cir. 2013) .....................16

*Morgan v. Swanson*, 755 F.3d 757 (5th Cir. 2014) .............................................................22

*Mumford v. Basinski*, 105 F.3d 264, 272-73 (6th Cir. 1997) .............................................8, 9

*Patel v. Searles*, 305 F.3d 130, 136 (2nd Cir.2002)............................................................12

*Pearson v. Callahan*, 555 U.S. 223 (2009)...................................................................23, 24

*Plotkin v. IP Axess, Inc.*, 407 F.3d 690, 696 (5th Cir. 2005) ..............................................15

*Pollard v. E.I. du Pont*, 523 U.S. 843, 848, 121 S.Ct. 1946, 1949 (2001)..............................4

*Ream v. Garrett*, 2015 WL 9703752, at *3 (N.D. Tex. Dec. 7, 2015)...........................................22

*Reyes v. Sazan*, 168 F.3d 158, 162-63 (5th Cir. 1999)......................................................................4

*Rodriguez v. City of Laredo*, 2007 WL 2329860 (S.D.Tex. 2007) .............................................13

*Rodriguez v. Gonzalez*, 2006 U.S. Dist. Lexis 71334 (S.D.Tex. 2006) .....................................13

*Schultea v. Wood*, 47 F.3d 1427, 1433 (5th Cir. 1995).................................................................26

*Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963)................................22

*Sims v. City of Madisonville*, 894 F.3d 632, 639 (5th Cir. 2018).............................................15

*Smith v. Chicago Bridge & Iron Co., N.V.*, 2017 WL 2619342 at *5 (S.D. Tex. June 16, 2017). ...........16

*Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353 (5th Cir. 2004) .......................15

*Sutton v. Village of Valley Stream*, 96 F. Supp.2d 189, 192-93 (E.D.N.Y.2000) ......................12

*Torres-Negron v. J&N Records, LLC*, 504 F.3d 151, 163 (1st Cir. 2007).....................................5

*United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 376 (5th Cir. 2004) .....................5

*Ward v. Lamar*, 484 S.W.3d 440, 446 (Tex.App. – Houston [14[th]] 2016, no pet.)....................13

*Warnock v. Pecos County, Tex.,* 88 F.3d 341, 343 (5th Cir. 1996)...........................................4, 5

*Welch v. Ciampa*, 542 F.3d 927 (1st Cir.2008)...............................................................................11

*Wernecke v. Garcia*, 591 F.3d 386 (5th Cir. 2009) .................................................................23, 24

*West Virginia Bd. of Ed. v. Barnette*, 319 U.S. 624, 642, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943).................6

*Wiggins v. Lowndes Cnty., Miss.,* 363 F.3d 387 (5th Cir. 2004).............................................23, 24

*Williams v. City of Austin*, 170 F. Supp. 3d 939, 948 (W.D. Tex. 2016) (Sparks, J.)................13

*Wyatt v. Fletcher*, 718 F.3d 496 (5th Cir. 2013) .....................................................................23, 24

*Zarnow v. City of Wichita Falls, Tex.,* 500 F.3d 401 (5th Cir. 2007) ....................................23, 24

## Other Authorities

Ohio Rev. Code § 2151.16...................................................................................................................8

Pattern Jury Instructions (Civil Cases) Fifth Circuit, 10.6 (2016) ..............................................15

## Rules

Fed. R. Civ. P. 8(a)(2)..........................................................................................................................5

FRCP 9(b) ............................................................................................................................................15

## RESPONSE TO DISTRICT JUDGES' MOTION
## TO DISMISS SECOND AMENDED COMPLAINT

**TO THE HONORABLE REED O'CONNOR,**
**UNITED STATES DISTRICT JUDGE:**

Plaintiff Diane Scott Haddock ("Plaintiff" or "Diane")[1] urges this Court to deny the Defendant District Judges' Motion to Dismiss [Doc. 38], for the reasons detailed in this Response.

## I.     OVERVIEW OF RESPONSE

### A.     Summary of Diane's Claims:

This is a First Amendment retaliation case, which includes both a hostile work environment and termination. Throughout most of 2018, Defendant Baca-Bennett – an elected public official (a politically vocal Texas state district judge) with the power to supervise and influence Diane's employment and conditions of employment[2] – abused her power and created a hostile work environment for Diane by engaging in a pattern of retaliation. Baca-Bennett's pattern of retaliation lasted almost a year and consisted of both public and private badgering, threats, back-biting, undermining and maligning (on the bench and off), and a campaign to orchestrate the termination of Diane's employment, all in retaliation against Diane for Diane's husband Gerald's political views and activity, as well as Diane's refusal of a direct command by Baca-Bennett that Diane intervene to prevent Gerald from engaging in such activity.[3]

Throughout 2018, Tarrant County – Diane's employer – consciously and repeatedly refused to protect Diane from First Amendment retaliation. Tarrant County (and the District

---

[1] This case involves Plaintiff Diane Haddock's job and the political activities of her husband, Gerald Haddock, and the use of the surname "Haddock" for both would likely be confusing. The parties have therefore followed the convention calling the Plaintiff and her husband by their first names.

[2] Until her unlawful termination on January 7, 2019, Diane was employed by Tarrant County for twenty (20) years as an Associate Judge-employee, having been unanimously appointed in October of 1998. She was the Senior Associate Judge-employee.

[3] During much of 2017-18, Gerald (*not Diane*) was actively and successfully involved in political campaigns in Tarrant County, Texas, and the United States. Baca-Bennett openly disagreed with Gerald's political activities or methods. The other judges were involved in their own election and re-election campaigns and did not, at least not overtly, comment. Although virtually all sought Gerald's endorsement and financial support.

Judges) refused to protect Diane even though Baca-Bennett's retaliatory activity was known to them because it was overt and public. They all refused despite reports from Diane that it was occurring, illegal, and debilitating, and despite Diane's plea for Tarrant County, at least, to intervene. Diane did not put the District Judges in the uncomfortable position of reprimanding a colleague; Diane instead followed the complaint procedures in the employee handbook. Tarrant County's policymakers (including County Commissioners and District Judges) refused to enforce Tarrant County's own written policy, which promises to protect all Tarrant County employees from First Amendment retaliation by elected officials or persons who regularly do business with Tarrant County.

On October 3, 2018, Diane filed this lawsuit asserting her First Amendment rights. Baca-Bennett and Tarrant County were served with process on October 10, 2018 and October 11, 2018. Less than ninety (90) days later[4], District Judges Nevarez, Newell, Wells, and Hennigan – a bare majority of the family court district judges – voted to terminate Diane's employment and end her 20-year career as an associate judge-employee. [5] Diane's Second Amended Complaint alleges her termination was a further violation of her First Amendment rights, either because Baca-Bennett's campaign to get Diane fired was ultimately successful with these four district judges, or because these four district judges – with Tarrant County's acquiescence and support – retaliated against Diane for filing this lawsuit.

Diane seeks the equitable remedies of reinstatement with back pay, or front pay in lieu of reinstatement, among other remedies.

---

[4] This Response refers frequently to this 90-day time period, because it forms part of the "chronology of events from which retaliation may plausibly be inferred," as discussed below at pp. 15-19.
[5] As her evidence will show in later proceedings, the iniquitous and cruel manner that Diane was fired effectively ended her career as a family lawyer in Tarrant County.

**B.**   **Grounds for Denial of 12(b)(1) and 12(b)(6) Motions:**

The District Judges' Motion to Dismiss should be denied because:

1) The Eleventh Amendment does not deprive this Court of jurisdiction over Diane's claims against the District Judges in their official capacities for the equitable remedies of reinstatement, or front pay in lieu of reinstatement; nor does the Eleventh Amendment deprive this Court of jurisdiction over Baca-Bennett in her individual capacity;

2) Diane's 12(b)(1) and 12(b)(6) facts demonstrate that Diane was not a policymaker or confidential employee, and her position as Associate Judge was not subject to a political patronage dismissal. In claiming it is, the District Judges ignore and misapply the clearly established precedents of *Elrod, Branti,* and *Rutan*, and they invite the Court to err by failing to acknowledge the *Pickering* balancing requirement, which must take place on a more fully developed record;

3) Diane's hostile work environment was an adverse employment action under the §1983 retaliation framework, now governed by *Burlington N*;

4) Diane has offered a timeline and evidence of pretext, which the Fifth Circuit has recognized as plausible evidence of retaliatory motive, not merely conjecture or speculation;

5) Baca-Bennett is not entitled to qualified immunity because Diane's right (as an associate judge-employee) to be free from First Amendment retaliation was clearly established.

For all of these reasons, the District Judges' Motion to Dismiss should be denied.

## II.   ARGUMENTS AND AUTHORITIES

**A.**   **The Eleventh Amendment does not bar Diane's claims.**

**1.**   **The Eleventh Amendment does not bar Diane's claims against the District Judges in their official capacities for the prospective injunctive relief of reinstatement or front pay in lieu of reinstatement.**

Against all seven (7) District Judges in their official capacities, Diane seeks only the prospective and equitable injunctive relief of reinstatement with back pay, or front pay in lieu of reinstatement. The Eleventh Amendment does not protect state officials from claims for *prospective relief* when it is alleged the state officials acted in violation of federal law. *Warnock*

*v. Pecos County, Tex.*, **88 F.3d 341, 343 (5th Cir. 1996)** (Two Texas state district judges could be ordered to reinstate county auditor who alleged non-renewal in violation of First Amendment). Reinstatement is prospective relief and not barred by sovereign immunity. *Id.* Claims for attorney's fees and costs associated with prospective relief are also not barred by the Eleventh Amendment. *Id.* (citing *Hutto v. Finney*, **437 U.S. 678, 692, 98 S. Ct. 2565, 2574, 57 L.Ed.2d 522 (1978).**

"A 'front pay' award is money awarded for lost compensation during the period between judgment and reinstatement or in lieu of reinstatement…[A]n award of front pay under **42 U.S.C. §1983** is an equitable remedy; thus, the district court has discretion to decide whether such an award is appropriate." *Epps v. Oklahoma Board of County Commissioners, et. al.,* **2019 WL 209576, *1 (May 13, 2019)** (citing *Pollard v. E.I. du Pont,* **523 U.S. 843, 848, 121 S.Ct. 1946, 1949 (2001)** and *Ballard v. Muskogee Reg'l Med. Ctr.*, **238 F.3d 1250, 1253 (10th Cir. 2001).** "'[F]ront Pay' is a form of prospective relief…" *Koppman v. South Cent. Bell Telephone Co.,* **1992 WL 280793 *4 (E.D.La. July 12, 1992)** (citing *Deloach v. Delchamps,* **897 F.2d 815, 822 (5th Cir.1990)**)). The Fifth Circuit has held that front pay is an appropriate alternative to reinstatement when reinstatement is not a practical possibility. *Deloach*, **897 F.3d 822.**

## 2. The Eleventh Amendment does not bar Diane's claims for compensatory damages against Baca-Bennett in her individual capacity.

The Eleventh Amendment does not bar suit against state officials in their individual capacities, even if arising from their official acts, *Hafer v. Melo*, **502 U.S. 21, 30-31(1991)**, unless the claim will "run to the state treasury" under state law. *Reyes v. Sazan*, **168 F.3d 158, 162-63 (5th Cir. 1999)**. Several courts have held that indemnification statutes do not mean the judgment "runs to the state" and therefore pose no Eleventh Amendment bar. *Id.*; *Cornforth v. University of Oklahoma Bd. of Regents*, **263 F.3d 1129, 1133 (10th Cir. 2001)**; *Gary A. v. New Trier High School Dist. No. 203*, **796 F.2d 940, 945 (7th Cir. 1986)**. See also *Jackson v. Georgia Dept. of*

*Transp.*, **16 F.3d 1573 (11ᵗʰ Cir. 1994).** Because a 12(b)(1) dismissal here, however unlikely, would be based on lack of subject-matter jurisdiction, such a dismissal would have to be without prejudice. ***Warnock v. Pecos County, Texas*, 88 F.3d 341, 343 (5ᵗʰ Cir. 1996).**

### 3.  Standard of Review:

On their remaining 12(b)(1) contentions, the District Judges substitute their jurisdictional argument with the merits of the case, and the Court should apply the 12(b)(6) standard. ***Torres-Negron v. J&N Records, LLC*, 504 F.3d 151, 163 (1ˢᵗ Cir. 2007).** Rule 12(b)(6) dismissals are rarely granted and generally disfavored, because the standard for dismissal is very high. *See, e.g., **Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 232 (5ᵗʰ Cir. 2009)**; ***Arthur H. Richland Co. v. Harper*, 302 F.2d 324, 325 (5ᵗʰ Cir. 1962).**[6] Federal Rule of Civil Procedure 8(a)(2) merely requires a short and plain statement of the claim showing the pleader is entitled to relief. **Fed. R. Civ. P. 8(a)(2).** A district court errs when it holds a plaintiff to a heightened pleading standard. ***Cicalese v. UTMB,* ---F.3d ----, 2019 WL 2127562, \*4 (5ᵗʰ Cir., May 16, 2019).** A court must "accept the complaint's well-pleaded facts as true and view them in the light most favorable to the plaintiff."[7] ***Cox v. Kaelin*, 577 Fed.Appx. 306, 310 (5ᵗʰ Cir. 2014)**; ***Johnson v. Johnson*, 385 F.3d 503, 529 (5ᵗʰ Cir. 2004).** Importantly, the Court should not evaluate the merits of the allegations, and instead should simply satisfy itself that a plaintiff has adequately pled a legally cognizable claim. ***United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 376 (5ᵗʰ Cir. 2004).**

### B.  Diane has shown a violation of her First Amendment rights.

In June of 2018, Justice Alito reiterated the paramount importance of the First Amendment:

> "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or *force*

---

[6] "This is another case proving that final disposition of a civil action on the basis of bare bones pleadings is a tortuous thing. How a standard so simply expressed, so often repeated, is apparently so often overlooked without even so much as a deferential mention of it is hard to understand." ***Harper*, 302 F.2d, at 325.**

[7] The District Judges' Motion makes absolutely no effort to copy the 12(b)(6) standard to Diane's facts.

*citizens to confess by word or act their faith therein.*" [citing ***West Virginia Bd. of Ed. v. Barnette*, 319 U.S. 624, 642, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943)**][8]

…

Compelling individuals to mouth support for views they find objectionable violates that cardinal constitutional command.[9]

The District Judges' argument (that Diane was subject to a patronage dismissal) insinuates: "to the victor belong the spoils." This condescending idea, however, runs contrary to the very first sentence the United States Supreme Court wrote in ***Rutan***:

"*To the victor belong* <u>*only those spoils that may be constitutionally obtained*</u>."

***Rutan v. Republican Party of Illinois*, 497 U.S. 62, 64 (1990)** (citing ***Elrod*** and ***Branti***, *infra*) (Emphasis added).[10] "[T]he First Amendment forbids government officials to discharge or threaten to discharge public employees solely for not being [their] supporters …" ***Id.***

### 1. <u>Diane is a simply a public employee, not a policymaker or confidential employee.</u>

The District Judges seek dismissal of the plaintiff's claims under their theory that Diane held a position that the District Judges claim legitimately required political affiliation or loyalty. Rather than apply the 12(b) standard to Diane's facts, however, the District Judges instead make their own blanket, unsubstantiated statement that associate judges are policymakers and confidential employees and, as such, are not protected by the First Amendment. ***Pickering*** requires first, a fact-specific inquiry, not available at this 12(b)(6) stage, and second, the judges' contention

---

[8] ***Janus v. American Federation of State, County, and Municipal Employees, Council 31, et al.*, --- U.S.----, 138 S.Ct. 2448, 2463, 201 L.Ed.2d 924 (2018)** (emphasis added in ***Janus***).
[9] ***Janus*, 138 S.Ct. at 2464.**
[10] Here, the "spoils" were weaponizing Diane's job and public salary in an attempt to force her to control or silence Gerald's open and overt exercise of his political speech, and when that failed, getting rid of Diane either because she refused or because she filed this lawsuit. The clear mandate was "stand with us and support our politics, or when we win, we will get rid of you."

is just wrong. Applying the correct 12(b) standard, the Court must consider the following facts to be true:[11]

1) Diane was an employee of Tarrant County, directed and supervised by both the county and certain of its policymakers – seven (7) family district court judges (pp. 33-36, ¶¶44-48).[12] Tarrant County delegated the day-to-day administration and oversight of its associate judge-employees to the district judges, and compensated them for it (*Id.*);

2) She served seven (7) different family district judges, rather than only one or two judges (*Id.*);

3) In the co-operative relationship between Tarrant County and the district judges, the county functioned as Diane's "employer;" the district judges (actual Tarrant County policymakers) functioned as her supervisors (p. 28, ¶32);

4) Tarrant County treated Diane as an employee. Among others things, it paid Diane's salary, reported her as an employee for federal income tax purposes, funded her retirement, offered her health and life insurance, required employee orientation, gave her awards only available to employees, and provided her an employee handbook and E-mail address (p. 28, ¶32; p. 49, ¶76);

5) In addition, Tarrant County provided facilities, technology, equipment, employee counseling, and courtroom security; (p. 28, ¶32);

6) Diane had no employees, no budget, no authority over when others worked or did not work, or how any other person's time off was characterized (p. 30, ¶38);

7) Diane had no authority to hire or fire anyone, or to determine the conditions of their employment (p. 30, ¶38);

8) Tarrant County delegated the day-to-day administration and oversight of its associate judge-employees (and other Tarrant County departments, as a policy making arm of the county)[13] to the district judges, and compensated them for it (*Id.*);

9) Knowing the district judges' preferences and following them was her job, it did not create a policymaker or confidential relationship between Diane and the

---

[11] Although the District Judges appear to request a "balancing test," ([Doc. 38], p. 5), they fail to acknowledge that the government – not the employee – must prove after a fact-intensive inquiry (not at the 12(b)(6) stage) that requiring political loyalty from employees in that position is essential to a government interest. *Elrod, infra,* **at 362.** As the Supreme Court also held in *Elrod,* however, patronage restrictions for public employees "are on balance *not* the least restrictive means" for fostering the government interests. *Elrod, infra,* **at 372.**

[12] For purposes of this factual recitation, all citations are to Plaintiff's Second Amended Complaint [Doc. 34].

[13] In their positions on the Juvenile Board, *inter alia.*

district judges, because those preferences were generally known and published by the district courts (p. 30, ⁋⁋37-38).

10) Diane had no policymaking authority whatsoever and was therefore not a policymaker, confidential employee, or even an advisor for Tarrant County or the district judges (p. 30, ⁋37-38);

11) While Diane had an independent, sworn duty to determine the law and the facts, and apply the law to the facts in individual cases assigned to her, all of her decisions were case specific (p. 30, ⁋37). She, unlike the District Judges, had no capacity to make "policies" or even advise the District Judges. She simply carried out individual district judges' policies.[14]

Diane was nothing more than a Tarrant County employee charged with the responsibility to hear certain cases assigned to her by the District Judges and to carry out their policy making decisions, plain and simple.

The District Judges cite a laundry list of activities (taken straight from the Texas Family Code) that associate judges are authorized to do. They argue this list somehow defines Diane as a "policymaker." However, every authorized activity the District Judges cite relates to specific and discrete family cases a district judge may assign to the associate judge. A more accurate definition of Diane's role is a family law "decisionmaker," not a policymaker. The District Judges do not cite a single policy Diane or any other associate judge allegedly makes, because there are none. All policymaking authority is held exclusively by Tarrant County and its delegated policymaking arm, for its court systems – the district judges.

The District Judges rely heavily on ***Mumford v. Basinski*, 105 F.3d 264, 272-73 (6ᵗʰ Cir. 1997)**. However, the plaintiff's position in ***Mumford*** was based on an Ohio state statute,[15] which provided, again, that the referee judge reports to <u>single</u> supervising judge – far different from this

---

[14] For example, one District Judge had a policy that all domestic violence cases required both victim and perpetrator to attend counseling; a different District Judge required all cases be mediated before a trial setting; yet another District Judge required her own signature on all associate judgment recommendations form.
[15] **Ohio Rev. Code § 2151.16**.

case, where Diane reported to seven (7) different district judges <u>and</u> Tarrant County, making political fealty impossible, both in theory and in practice.[16]

After the 12(b)(6) stage, it will be the District Judges who have the burden of proving Diane held a job that required political loyalty to all seven (7) of the family district judges and Tarrant County's other policymakers. ***Elrod* 427 U.S. at 368** (the government-employer bears the burden of establishing that the employee falls within the confines of this doctrine); ***Branti***, **445 U.S. at 517** (the government must demonstrate that party affiliation is an appropriate requirement for the job in question). Diane was an unelected, associate judge-employee, swearing an oath to make decisions based on the laws and facts, not on political affiliation (Second Amended Complaint, p. 29, ¶¶35-36). Whether her job required political affiliation is necessarily a fact-specific inquiry. The ***Elrod*** Court held that a determination of whether political allegiance is required for a specific job depends on the nature of the responsibilities for that job. **427 U.S. at 368**.

The case of ***Jakomas v. McFalls***, **229 F.Supp. 2d 412 (W.D. Penn. 2002)** (cited and relied upon by Tarrant County for other reasons), is particularly instructive regarding 12(b)(6) motions. ***Pickering*** requires a fact-specific inquiry and balancing test. Fact-specific inquiries are not permitted at the 12(b)(6) stage of litigation. ***Jakomas*** plainly states:

> *[T]he factors we must balance under <u>Pickering</u> are not sufficiently developed at [the 12(b)(6)] stage in the litigation for us to make that determination. Therefore we find that the plaintiffs have alleged the appropriate facts to survive a motion to dismiss, and we will deny Judge McFalls' motions to dismiss."*

***Jakomas*,** **at 421.**

The District Judges' request for a "balancing test" is premature, and their 12(b)(1) Motion should be denied.

---

[16] The District Judges' Co-Defendant Tarrant County also relies heavily on ***Mumford*** and other cases in which court personnel worked for a single elected judge or official. For the distinction of those cases, see Plaintiff's Response to Defendant Tarrant County's Rule 12(b)(6) Motion to Dismiss [Doc. 40], pp. 14-15, n. 21.

While it is not yet time for the Court to perform the *Pickering* balancing test, Defendants' own contradictory assertions demonstrate the difficulty they will have meeting their burden. Specifically, in arguing that Diane's role as an associate judge-employee required her political loyalty to be effective in performing her responsibilities, they admit that "[a] district judge must be able to rely on an associate judge to implement the same or similar judicial policies *as the district judge*." [Doc. 38, p. 7, Emphasis added.] Diane agrees with this statement and points out that *even the Defendants* accept that *they* are the policymakers – the associate judges simply serve to carry out the District Judges' policies. That is the way the position of associate judge was created in Tarrant County and how it has functioned since the beginning.[17] To make the associates judges policymakers would, simply put, create utter chaos. No party could expect consistency within the family courts should every associate judge implement their own policies, not the policies of the elected district judges. The process would slow to a halt, be inefficient and expensive. That the associate judges would simply carry-out the policies of the district judges to improve court efficiency was the entire reason Tarrant County established the associate judge program in the first place.

The First Amendment protects non-policymaking employees, like Diane, from retaliation by their government employers or other public officials for protected speech, political activity, or political affiliations. The Supreme Court recognized this right in ***Elrod v. Burns*, 427 U.S. 347, 96 S. Ct. 2673, 49 L.Ed.2d 547 (1976):**

> The cost of [requiring patronage in public employment] is the restraint it places on freedoms of belief and association…***Elrod*, at 354**…[A] member of the out-party…works for the election of his party's candidates and espouses its policies at the [risk of his job].  [This is] ***tantamount to coerced belief… Elrod*, at 355.** Our

---

[17] While Diane was not required to plead every fact supporting her claim, the evidence in later stages of the case will show that no Tarrant County associate judge (and certainly not one with Diane's experience and qualifications) has been fired on political loyalty grounds in the history of Tarrant County's associate judge program. Indeed, there have been many instances where the District Judge policymakers changed (by election), but the associate judge-employees did not. Not a single time, before Diane, have the District Judges or Tarrant County acted with such reckless disregard for the constitutional rights of an associate judge-employee.

concern with the impact of patronage on political believe [sic] and association does not occur in the abstract, for political belief and association constitute the core of those activities protected by the First Amendment.

*Elrod*, **at 356.** Baca-Bennett, Tarrant County officials and the District Judges were all free to engage in their own uninhibited, robust and wide-open debate by publicly supporting Munford, if they believed judicial ethics allowed it and they wanted to do so.[18] What Baca-Bennett, Tarrant County and the other District Judges were constitutionally prohibited from doing was threatening to fire Diane because she would neither support Munford nor stop Gerald from opposing him, and retaliating against her through a hostile, intimidating and offensive work environment in an effort to force Diane to resign or silence Gerald. The district judges and Tarrant County were also prohibited from terminating Diane in retaliation for Gerald's political activity, or her refusal to stop him, or … filing this lawsuit.

So fundamental are these protections that demanding patronage of a public employee "cannot be justified merely by showing a 'legitimate state interest.'" *Elrod,* **at 362**. Rather, the claimed government interest "must be paramount, one of vital importance, and *the burden is on the government* to show the existence of such an interest." *Id.* The Supreme Court wrote that patronage restrictions for public employees are "on balance *not* the least restrictive means for fostering the government's interests." *Elrod*, **at 372.**

Refusing political patronage to an issue or candidate has the same protection as unpopular political patronage.[19] *Welch v. Ciampa*, **542 F.3d 927 (1ˢᵗ Cir. 2008)**. And, the right of intimate association extends to the husband-wife relationship, and a government official or *de facto* policymaker violates the First Amendment right to free association by retaliating against an

---

[18] Diane, on the other hand, upheld her oath and the Judicial Canons of Ethics, and never publicly supported any candidate, including Munford.

[19] Like Diane's refusal to become involved in political campaigns.

employee because of her husband's political activities. ***Sutton v. Village of Valley Stream***, **96 F. Supp.2d 189, 192-93 (E.D.N.Y.2000);** ***Patel v. Searles***, **305 F.3d 130, 136 (2nd Cir. 2002)**.

Given this precedent, it is abundantly clear that Diane has sufficiently pled violations of her constitutional rights not only to associate with her husband, but also to be free from retaliation because of <u>his</u> speech or political activity or her refusal to intervene against him. Baca-Bennett and Tarrant County put Diane in an untenable position – "disassociate (divorce) from your husband or lose your job." The District Judges then carried out Baca-Bennett's threat by terminating Diane – either because of Baca-Bennett's campaign or because Diane filed this lawsuit asserting her First Amendment rights.

### 2.    <u>Diane's hostile work environment was an adverse employment action and First Amendment retaliation under *Burlington N.* and its progeny.</u>

The District Judges assert that Diane's hostile work environment due to First Amendment retaliation is not an "adverse employment action."  ([Document 40], pp. 8-10).[20] They base this argument on two twenty-year-old Fifth Circuit cases that pre-date ***Burlington N. & Santa Fe Ry. Co. v. White***, **548 U.S. 53, 68 (2006)**.[21] In ***Burlington,*** the Supreme Court substantially lowered the threshold for retaliation cases and clearly emphasized that what constitutes an adverse employment action *depends on the circumstances*:

> Context matters. The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed....Hence, a legal standard that speaks in general terms rather than specific prohibited acts is preferable, for an act that would be immaterial in some situations is material in others.

***Id.*** **at 69**.

---

[20] Only the District Judges assert this argument – it does not appear in Tarrant County's 12(b)(6) Motion [Doc. 36], and Tarrant County appears to have abandoned it.
[21] ***Beattie v. Madison Cnty. Sch. Dist.***, **254 F.3d 595 (5th Cir. 2001)** and ***Breaux v. City of Garland***, **205 F.3d 150 (5th Cir. 2000)** are both pre-***Burlington***, *infra*.

Courts in the Fifth Circuit are already applying *Burlington* to §1983 retaliation claims. One district court in the Fifth Circuit had already read Fifth Circuit case law to suggest that "the definition of adverse employment action is broader in §1983 retaliation claims than in the Title VII context." *Rodriguez v. Gonzalez*, **2006 U.S. Dist. Lexis 71334 (S.D.Tex. 2006)**. After *Burlington*, the Fifth Circuit assumed that *Burlington* altered the §1983 retaliation framework. *McLaurin v. City of Jackson Fire Dep't*, **2006 U.S.App. Lexis 31274, 3-4 (5th Cir. 2006)**. At least two district courts within the Fifth Circuit have since applied the lower *Burlington* standard to §1983 cases. In *Rodriguez v. City of Laredo*, **2007 WL 2329860 (S.D.Tex. 2007)**, the court found that an investigation of an employee – standing alone – constituted an adverse employment action in a §1983 case:

> The *Burlington* retaliation framework asks only whether "a reasonable employee would have found the challenged action materially adverse, which means it well might have dissuaded a reasonable worker from" engaging in the protected conduct…The Court rejects Defendants' argument that Plaintiffs have failed to allege actionable employer conduct under §1983.

*Rodriguez,* **2007 WL 2329860, at \*3**. See also *Sherrod v. Prairie View A & M University*, **2011 WL 843936, \*8 (S.D. Tex. 2011)** (materially adverse meant the action might have dissuaded a reasonable worker from making or supporting a charge of discrimination). [22]

---

[22] Courts have also applied *Burlington* in other types of retaliation cases. For example, citing *Burlington*, the court in *Jumbo v. Dolgencorp of Tex. Inc.*, **No. 4:15-CV-1451, 2017 WL 4475932, at \*10 (S.D. Tex. Sep. 30, 2017)** explained that "the plaintiff must simply show that the action taken by the employer would dissuade a reasonable worker from complaining of discrimination. The Fifth Circuit has recognized that 'even the threat of discharge can be a potent means of chilling the exercise of constitutional rights.' *Any reasonable employee would hesitate before making a complaint of discrimination if he thought that he would lose his job for speaking out.*" (Emphasis added). Other courts have also noted, that the standard for determining an adverse employment action is lower for retaliation claims. *Williams v. City of Austin*, **170 F. Supp. 3d 939, 948 (W.D. Tex. 2016)**. Specifically, for an action to be an "adverse employment action" in a retaliation claim under Title VII, "a plaintiff must show that *a reasonable employee would have found the challenged action materially adverse, which . . . means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.*" *Id.* (*citing Burlington, infra. N & Santa Fe Ry. Co. v. White*, **548 U.S. 53, 68 (2006)).** (Emphasis added). The Texas Supreme Court also adopted the *Burlington* materiality standard for retaliation cases under the Texas Whistleblower Act. *Montgomery County v. Park*, **242 S.W.3d 610, 614-15 (Tex. 2007)**. Following *Montgomery County*, the Houston Court of Appeals articulated five non-exclusive factors to be considered: whether the action was likely to negatively affect the employee's (1) prestige, (2) opportunity for advancement, (3) working conditions, (4) pay or income, or (5) ability to obtain outside employment. *Ward v. Lamar*, **484 S.W.3d 440, 446 (Tex.App. – Houston [14th] 2016, no pet.)**. The presence or absence of any of these factors is not dispositive, and the effects of a challenged action must be considered as a whole and in light of all the circumstances. *Id.* An act that would be immaterial in some situations is material in others. *Id.*

Hostile work environment from First Amendment retaliation can even rise to the level of constructive discharge. **Clancey v. City of College Station,** **2011 WL 335148 (S.D. Tex. 2011).** Among other claims, in **Clancey,** the chief of police alleged he had entered one of his supervisor's offices one day to find a mock-up of the local newspaper's front page with a photo of himself and the caption "Police Chief Steps Down."[23] The supervisor allegedly told him, "Things are not working out. We need to make a change and are going to let you go."[24] The court held these factual allegations constituted a *prima facie* case that the police chief had been constructively discharged. If a supervisor's public statements that a public employee has resigned, coupled with unveiled attempts to have that employee fired, can constitute a constructive discharge, it can certainly constitute severe and pervasive hostile work environment.

In the case at hand, the repeated threats to Diane discussed above are substantial. They silenced Gerald's political activity,[25] and they caused Diane harm.[26] Taking Diane's facts as true, it is obvious that any future employee in her position would likely be dissuaded from engaging in free speech, or would feel compelled to silence a spouse to save her job (and reasonably so – "remember what happened to Diane.").

The District Judges' Motion should be denied because Diane has stated a First Amendment retaliation claim for hostile work environment.

---

[23] The Facebook posts detailed in Plaintiff's Second Amended Complaint about Diane's alleged "resignation" (which would likely have reached hundreds if not thousands) were far worse than Clancey's supervisor's having merely presented only him with a mock-up newspaper headline saying he had resigned.  Defendant Baca-Bennett's Facebook posts and contributions to the feloniously operated and defamatory web site were also worse than Clancey's private experience with the fake newspaper. (Second Amended Complaint, pp. 12-13, 17-18, Exhibit 16, 19).
[24] These mirror Baca-Bennett's public and private threats to fire Diane, demands that Diane control Gerald coupled with reminders about "who she works for," along with the actual attempts to get Diane fired. (Second Amended Complaint, pp. 12, 19-21).
[25] Second Amended Complaint (p. 48; ¶74).
[26] Even before the hostile work environment caused Diane's termination, she suffered significant mental anguish, which led to seeing a counselor and having to go on heart medication (Second Amended Complaint, p.22; ¶18).

**3.** **Diane has offered far more than mere speculation or conjecture that her termination was First Amendment retaliation, either for Gerald's political activity of for filing this lawsuit.**

The District Judges contend that Diane relies on her "purely speculative belief" and "nothing more than her own personal speculation to posit some causal link" between Baca-Bennett's conduct and Diane's termination.[27] For some unknown reason, the District Judges cite three fraud cases based on the heightened fraud pleading requirement of **FRCP 9(b)**.[28] Diane has not sued any defendant in this case for fraud, and **FRCP 9(b)** does not apply to this case.  As the Fifth Circuit recently held, "[a] district court errs when it holds a plaintiff to a heightened pleading standard." ***Cicalese*, ---F.3d ----, 2019 WL 2127562, \*4**.

The causation standard for First Amendment retaliation cases in the Fifth Circuit is whether the protected activity was a "motivating factor" in the termination decision. ***James v. Tex. Collin Cnty.*, 535 F.3d 365, 376 (5th Cir. 2008); Pattern Jury Instructions (Civil Cases) Fifth Circuit, 10.6 (2016)** ("Plaintiff's [speech/activity/refusal/filing this lawsuit] motivated Defendants to terminate Plaintiff"). It is also well-settled law in the Fifth Circuit that circumstantial evidence on causation is enough to preclude summary judgment, much less preclude a 12(b)(1) or 12(b)(6) denial.  As one court recently explained:

> Retaliation cases must often be proven with "the cumulative weight of circumstantial evidence, since an employer who discriminates against its employee is unlikely to leave a well-marked trail, such as making a notation to that effect in the employee's personnel file."

---

[27] [Doc. 38], at p. 12.

[28] ***Plotkin v. IP Axess, Inc.*, 407 F.3d 690, 696 (5th Cir. 2005)** (applying **FRCP 9(b)** fraud pleading standard to Private Securities Litigation Reform Act of 1995 ("PSLRA") claim); ***Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333 (5th Cir. 2008)** (applying **FRCP 9(b)** fraud pleading standard to federal securities and state law fraud claims); and ***Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353 (5th Cir. 2004)** (applying **FRCP 9(b)** fraud pleading standard to Securities and Exchange Act 10(b) and PSLRA claim). It is unclear exactly why, but the District Judges also cite ***Sims v. City of Madisonville*, 894 F.3d 632, 639 (5th Cir. 2018)** regarding causation and Diane's termination. ***Sims*** itself states that it only applies to liability of an official *in the official's individual capacity.* "We first address the individual liability claims brought against Covington…." ***Sims*, 894 F.3d at 637.** "[I]ndividual liability for a government official who violates constitutional rights…turns on traditional tort principles of "but-for" causation." ***Sims*, 894 F.3d at 639.** Here, *only Baca-Bennett is sued in her individual capacity. All of the terminating judges in this case are being sued in their official capacities only*, and the standard is "motivating factor." ***James v. Tex. Collin Cnty.*, 535 F.3d at 376.**

*Smith v. Chicago Bridge & Iron Co., N.V.*, 2017 WL 2619342 at *5 (S.D. Tex. June 16, 2017).

A plaintiff can meet her burden on causation by relying on circumstantial evidence to form "a chronology of events from which retaliation may plausibly be inferred." ***Bosque v. Starr Cty., 630 Fed. App'x 300, 305 (5th Cir. 2015); Mooney v. Lafayette County School Dist., 528 Fed.App'x. 447, 456-57 (5th Cir. 2013); Brady v. Houston Indep. Sch. Dist., 113 F.3d 1419, 1424 (5th Cir. 1997)***.  The Fifth Circuit also recognizes what is now commonly referred to as the "cat's paw" theory, where a decisionmaker without retaliatory animus is influenced by a person with a retaliatory motive. ***Gee v Principi, 289 F.3d 342, 346-347 (5th Cir.2002).*** The cat's paw theory can also be proven with circumstantial evidence. ***Id.*** And, as the Supreme Court observed almost 50 years ago in ***Pickering***, when an employer's stated reasons for firing someone (even if true) is too trivial to rationally justify the employee's termination, that is sufficient from which to infer the employer's unlawful intent. ***Pickering*, 391 U.S. at 579-580, n1.** *See also **Laxton v. Gap Inc.**, **333 F.3d 572, 581 (5th Cir. 2003)*** (allegations were "so trivial as to be unworthy of credence."); ***Boehms v. Crowell, 139 F.3d 452, 458 (5th Cir. 1998)***.  For Diane, of course, no reason was offered, *at all,* for terminating a 20-year veteran of the family court, which is equivalent to a trivial reason and gives rise to the same inference of retaliation, especially at the 12(b)(6) stage.

Applying the correct 12(b)(1) or 12(b)(6) analysis, the Court must treat each of the following facts as true:

1) While Diane was performing the duties of the job she was hired to do, Baca-Bennett subjected Diane – both publicly and privately – to severe and pervasive harassment and a hostile work environment for several months, in retaliation for, *inter alia*:

    a) Diane's refusal to advocate positions or patronize a judicial candidate Baca-Bennett endorsed and supported (Baca-Bennett's friend and colleague); (p. 6, ⊮15).[29]

    b) Diane's refusal to "get her husband [Gerald] under control" and stop him from supporting Munford's opponent in the election primary (*Id.*); and

    c) Diane's refusal to "get her husband under control" and stop him from engaging in and supporting political speech, in which he and others advocated for the Second Amendment – one of the central issues in Munford's election campaign (*Id.*);[30]

2) Judge Newell won his March 2018 primary and had no opponent in the fall general election. He visits Diane April 26, 2018. He tells Diane, "I want to be clear – I have not made a decision about what to do with you," or words to that effect (pp. 20-21, April 26, 2018);

3) Baca-Bennett posted on Facebook that, despite the clear language of the statute (**Family Code 201.001(d)**), she and "a majority" of the family court district judges have made a pact that they will vote to give each colleague his/her preference [rather than hiring/firing associate judges based on an independent analysis related to merit, experience, qualification and performance] (p. 20, April 5, 2018; Ex. 22);

4) Newell acknowledges he is well aware of Baca-Bennett's public posts, but Newell acknowledges that Diane is the most qualified person for her associate judge position and states again, "I just don't know what I am going to do with you" (p. 21, April 26, 2018);

5) On October 3, 2018, Diane filed this lawsuit, and Baca-Bennett and Tarrant County were served on October 10 and 11, 2018 (p. 2);

6) Within days of being served and without Diane's knowledge, the District Judges had Tarrant County removed Diane's name from the 2019 jury calendar (p. 24, ⊮25);

7) Within only 90 days of Diane's serving her lawsuit, on January 4, 2019 – the same day Newell is sworn in – he, Nevarez, Wells and Hennigan *all* terminated Diane at the exact same time, on the exact same day, for "no reason" and even without Diane's knowledge[31] (p. 23-24, ⊮22; Ex. 25);

---

[29] All citations in this section are to Plaintiff's Second Amended Complaint [Doc. 34].

[30] The specific details of Diane's severe and pervasive hostile work environment are described in roughly fifteen (15) pages of her Second Amended Complaint (pp. 6-21).

[31] The District Judges, collectively, signed an order terminating Diane on 01/04/2019 [Ex. 25]. On 01/06/2019 (Sunday), as was her routine custom, Diane went to the courthouse to review her cases for the next day. She reported to work on 01/07/2019, and (much to her shock) was presented the order terminating her, "effective immediately." She was then escorted out of the facilities.

8) Diane is replaced with a less qualified candidate – the same person who emceed Newell's investiture ceremony hours before the four judges terminated Diane. (p.24, ¶24).

Baca-Bennett's public tirades about Gerald, her campaign to force Diane to resign, and her attempts to call a meeting to have Diane fired – which occurred throughout 2018 – are detailed below at pp. 24-26, and they permeated the family law courthouse.  From Baca-Bennett's public tirade and the fact that she tried to call a meeting of the then-seated district judges and have Diane fired, Diane is entitled to the inference that Baca-Bennett also lobbied Judges Nevarez, Wells and Hennigan – three of the decisionmakers on her termination – directly in the same way she lobbied everyone else.  Alternatively and equally plausibly, Diane is entitled to the inference that Nevarez, Wells and Hennigan were well aware of Baca-Bennett's anti-Diane campaign. Either way, Diane has shown their awareness and is entitled to the inference that Baca-Bennett's retaliatory motive influenced these three decisionmakers.

Judge Newell acknowledged to Diane in April of 2018 that he knew about Baca-Bennett's campaign to have Diane fired.  Diane is entitled to the inference that, despite his April 2018 statements that he "didn't know what he was going to do with [her]," Judge Newell did in fact know and was planning to replace Diane because of the political turmoil created by Baca-Bennett's rampages. The other three decisionmakers – Nevarez, Wells, and Hennigan – either shared his motives, or they gave Newell his way despite his motives, because of the judges' "pact" (Ex. 22).

Alternatively, Diane is entitled to the equally plausible inference that Newell was being candid and sincere in April of 2018. Since investitures take a considerable amount of time to plan, Diane is entitled to the inference that her replacement (who emceed Newell's investiture) was chosen well in advance, and therefore the decision to fire her was made several weeks before January 4, 2019 (likely within a few weeks or even days of filing her lawsuit.) The October 2018

decision to remove Diane from the 2019 trial calendar also supports this inference. This means **something changed** between Newell's April 2018 "I don't know what I'm going to do with you" and the decision to terminate her in October of 2018. Two very likely "*somethings*" that changed were: 1) <u>nobody</u> – including Tarrant County, its policymakers, County Judge Glen Whitley, or the then-seated district judges – did anything to resolve the political turmoil caused by Baca-Bennett (which gives rise to the inference that Nevarez, Wells and Hennigan agreed with Baca-Bennett and were willing to give her her way about Diane); and 2) Diane filed this lawsuit on October 3, 2018 (which unquestionably angered Tarrant County and the then-seated district judges).

Baca-Bennett actively lobbied publicly for Diane's ouster for months. Subsequently, four judges met on January 4, 2018, and decided *at the same time, on the same day*, to terminate Diane – a 20-year veteran and the most senior and experienced associate judge – *for "no reason."* These facts give rise to the "***Pickering*** pretext inference" that the real reason was First Amendment retaliation. Diane does not have to plead or prove at this stage:

- Whether Baca-Bennett influenced Nevarez, Wells, and Hennigan directly;

- Whether Baca-Bennett merely influenced Newell who then influenced Nevarez, Wells and Hennigan;

- Whether Baca-Bennett influenced Newell, who was then was given his choice by Nevarez, Wells and Hennigan (no matter what his motives were);

- Whether Newell, Nevarez, Wells and Hennigan were motivated by Diane's filing this lawsuit;

- Whether Newell alone was motivated by Diane's filing this lawsuit but was given his choice by Nevarez, Wells and Hennigan despite his motives;

- Whether Tarrant County's policymakers, Judge Glen Whitley, and the Tarrant County Commissioners influenced the District Judges (including Newell) to fire Diane because Diane had filed this lawsuit; or

- Some combination of the above.

In the famous words of Harold S. Kushner, "there is no right way to do a wrong thing." Each of these possibilities above is legally actionable, and at the 12(b)(6) stage, none of them is a significant leap given the clear timeline and the "no reason" pretext.

Finally, the District Judges attempt to dismiss as "insidious" Diane's claim that she experienced a hostile work environment over Gerald's politics, complained about it (first to Tarrant County, then to this Court), then was terminated for Gerald's politics or for filing this lawsuit. They claim to have acted with "absolute integrity and independent conscientiousness" when they fired her. They expect this Court to believe that – by coincidence – they each independently decided to terminate Diane at the *same time*, on the *same day* (on her twentieth anniversary serving them), with *no* prior warning, for *no* reason,[32] *and coincidentally within ninety (90) days of Diane's serving this lawsuit*! Where was the District Judges' umbrage over "insulting the integrity of the bench"[33] when, for instance:

- Associate Judge Munford's wife claimed publicly Diane had taken a bribe;

- Baca-Bennett publicly supported Munford's campaign in violation of the Texas Code of Judicial Conduct, Canon 2B;

- Baca-Bennett publicly posted on Facebook alleged private conversations and agreements among "a majority" of the Tarrant County Family District Court judges;[34]

- Baca-Bennett engaged – on and off the bench – in months-long public tirades against Gerald's politics and Diane's job, including identifying Gerald on Facebook as the "husband of Associate Judge Diane Haddock;"

- Baca-Bennett contributed content to a criminally operated web site created solely for the purpose of defaming Diane and Gerald, which was then further published on Facebook to a group called Tarrant County Lawyers;

---

[32] Diane had never, in 20 years, received a complaint, reprimand, or even a caution from the policymakers/district judges she served (Exhibit 1).
[33] District Judges' Motion to Dismiss [Doc. 38], p. 12.
[34] Exhibit 22, p. 1

- They learned of Baca-Bennett's public, unofficial efforts in the lawyer's lounge to get Diane fired, discussing private court employee matters with and in front of non-judicial personnel.[35]

The very fact that the then-seated District Judges did nothing to protect Diane from Baca-Bennett's abusive behavior is, in and of itself, evidence that they secretly supported it. This, in turn, gives rise to the inference that this shared agenda was a motivating force behind Diane's termination.

The District Judges' Motion to Dismiss should be denied because Diane has properly pled facts showing First Amendment retaliation was the motive for her termination.

C. **Baca-Bennett is not entitled to a 12(b)(6) dismissal on qualified immunity**

1. **Diane's First Amendment right was clearly established by *Elrod* and its progeny.**

By January 1, 2017, when Baca-Bennett took office – and certainly before she began retaliating against Diane, a score of cases had already held that retaliating against a public employee for engaging (or refusing to engage) in political activities violated the employee's First Amendment rights. Diane's right to protection from retaliation for her refusal to engage in political activities was well-settled law long before Baca-Bennett began retaliating against her. *See **Charles v. Grief**, 522 F.3d 508, 511 (5th Cir. 2008)* ("Terminating an employee for engaging in protected speech . . . is an objectively unreasonable violation of such an employee's First Amendment rights.").

Baca-Bennett is essentially asking this Court to rule that a right is not clearly established unless there has been a decision expressly recognizing the constitutional rights of a Texas associate judge-employee serving seven district courts. This parses the issues much too finely and is not the standard when assessing whether an official has notice of clearly established law. Rather, the test

---

[35] All of the bullet points arguably violate the Texas Code of Judicial Conduct, which requires judges to act in a manner that enhances, maintains and preserves confidence in our judicial system.

is whether, in light of pre-existing law, the contours of the right are such that the unlawfulness is apparent. *Anderson v. Creighton*, **483 U.S. 635, 640 (1987)** ; *Morgan v. Swanson*, **755 F.3d 757 (5th Cir. 2014)** . Further, the term "clearly established" does not require that the precedent is "factually on all-fours with the case at bar." *Atteberry v. Nocona Gen. Hosp.*, **430 F.3d 245, 256 (5th Cir 2005).** *See also Ream v. Garrett*, **2015 WL 9703752, at \*3 (N.D. Tex. Dec. 7, 2015)** (fundamentally or materially similar facts are not necessary for an official to be "on notice that their conduct violates established law even in novel factual circumstances").

Perhaps the Fifth Circuit put it best in *Brady v. Fort Bend County*, **145 F.3d 691 (5th Cir. 1998)**:

> *For more than two decades, the Supreme Court has consistently held that "the First Amendment forbids government officials to discharge <u>or threaten to discharge</u> public employees solely for not being supporters of the political party in power, unless party affiliation is an appropriate requirement for the position involved."* [citing *Rutan, Branti* and *Elrod*].
> …
> **In *Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963)**, the Court observed that "[i]t is too late in the day to doubt that the libert[y] of ... expression may be infringed by the denial of or placing of conditions upon a benefit or privilege." *Id.* at 404, 83 S.Ct. 1790. *If it was too late in the day three-and-a-half decades ago to consider the County's argument that the Plaintiffs' First Amendment rights could not have been violated by Molina's failure to rehire them because they had no right or expectation of being rehired, it is certainly too late to consider it now.* (Emphasis added).

**Brady, at 702-703.** In the same vein, if it was "too late" for the Fifth Circuit in 1998, surely it is too late now – over twenty (20) years later, in 2019.

The Sixth Circuit also rejected Baca-Bennett's argument in *McCloud v. Testa*, **97 F.3d 1536, 1556 (6th Cir. 1996)**:

> We can easily dispense with Testa's argument that uncertainty about the facts relevant to where to place the employment positions at issue with respect to *Branti* leads to the conclusion that he is entitled to qualified immunity. *Testa is entitled to qualified immunity only if the <u>law</u> is unclear, not the facts.*
> …

> *We reject the notion that there must be a separate patronage dismissal decision by the Supreme Court or the Sixth Circuit involving a particular position before qualified immunity can be denied in such a case….Testa's argument must fail. <u>It simply cannot be true that there must be a specific patronage dismissal case in the Supreme Court or Sixth Circuit before qualified immunity can be denied to any otherwise eligible defendant in such a case</u>. If this were true, qualified immunity would be converted into a nearly absolute barrier to recovering damages against an individual governmental actor in patronage cases because the reported case law classifies new positions very slowly.*

**Testa**, **at 1556.** (Emphasis added).

The same logic is applicable here. It simply strains credibility that any reasonable government official in 2017-2018 – especially a state district judge like Baca-Bennett, who swore to uphold the Constitution[36] – could fail to understand this well-established principle of law: First Amendment rights may only be infringed when infringement is essential to a vital government interest. **Elrod**, **at 362.** Even then, the government must show that infringement was the least restrictive means of accomplishing the interest. **Elrod at 372**. Baca-Bennett and the District Judges have failed to articulate – nor can they prove – how in the world Gerald's political activity interferes in anyway with Diane's ability to do her job, apply law to fact in specific family law cases, and carry out the policies of the District Judges.

Baca-Bennett's reliance on the cases she cites in her Motion is deeply flawed. Nearly every case she cites regarding "clearly established right" involves school administrators, nurses, or police officers – lay people who cannot be expected to know the law, or, as in the case of police officers, how to apply it in to rapidly evolving and often exigent circumstances.[37] Just as importantly, nearly

---

[36] Second Amended Complaint, p. 29, ¶36.

[37] See, e.g., **Pearson v. Callahan**, **555 U.S. 223 (2009)** (police officers – 4th Amendment search and seizure); **Zarnow v. City of Wichita Falls, Tex.,** **500 F.3d 401 (5th Cir. 2007)** (police officers – 4th Amendment search and seizure [cites **Pierce v. Smith** – doctors supervising state medical residency program – 4th Amendment issue re: drug test); **Wiggins v. Lowndes Cnty., Miss.,** **363 F.3d 387 (5th Cir. 2004)** (non-lawyer county officials re: road foreman); **Kovacic v. Villarreal,** **628 F.3d 209 (5th Cir. 2010)** (police officers who had released a drunk driver); **Wernecke v. Garcia**, **591 F.3d 386 (5th Cir. 2009)** (police officers confronted with minor child in immediate health crisis); **Wyatt v. Fletcher**, **718 F.3d 496 (5th Cir. 2013)** (public school officials – 4th and 5th Amendment issues related to disciplinary action); **McClendon v. City of Columbia**, **305 F.3d 314 (5th Cir. 2002)** (police officer loaned gun to confidential informant, who shot plaintiff).

every "clearly established right" case Defendant Baca-Bennett cites was an appeal from a summary judgment or a full trial on the merits with a much more fully developed record than this Court has at the 12(b)(6) stage.[38]

### 2. Baca-Bennett's own conduct outside her official duties demonstrates that she is not entitled to qualified immunity.

Baca-Bennett's official duties as a Texas state district judge in Tarrant County include, *inter alia*, presiding over cases in the 360th Judicial District Court, referring cases from the 360th to any of the seven (7) family court associate judges, reviewing decisions by the associate judge to whom the referral was made, exercising her vote to appoint and/or terminate associate judges, serving on the Tarrant County Juvenile Board, and making policies therein. Her official duties do *not* include the following non-judicial acts, which the Court must take as true for 12(b) purposes:[39]

- Monitoring Gerald's political activities and carping about them publicly (p. 13, February 24, 2018; Exhibit 7);

- Threatening Gerald that he has "forgotten who Diane works for," in an attempt to curtail his campaign activity against Munford (p. 12, early December 2017 – mid-February 2018);

- Supporting Associate Judge Jim Munford's judicial candidacy for the district bench (p. 13, February 24, 2018; Exhibits 6-7);[40]

- Appointing herself as a "mediator" between Diane and Munford (pp. 9-11, October 25, 2017 – October 31, 2017; Exhibits 2-5);

- Texting Diane in off-hours and weekends about personal (not personnel) political issues (pp. 9-11, October 25, 2017 – October 31, 2017; Exhibits 2-5);

- Enlisting others to support Munford, or not to oppose him (pp. 11-12, Early December 2017 – mid-February 2018);

---

[38] See, e.g., ***Pearson***, 555 U.S. 223 (appeal from MSJ denial; ***Zarnow,*** 500 F.3d 401 (MSJ appeal); ***Wiggins***, 363 F.3d 387 (appeal from jury verdict); ***Branti***, 445 U.S. 507 (appeal from permanent injunction); ***Kovacic***, 628 F.3d 209 (appeal from denial of MSJ; police officers who had released a drunk driver); ***Wernecke***, 591 F.3d 386 (appeal from MSJ); ***Wyatt***, 718 F.3d 496 (full trial on the merits); ***McClendon***, 305 F.3d 314 (appeal from MSJ); ***Aucoin v. Haney***, 306 F.3d 268 (5th Cir. 2002) (appeal from MSJ). One extremely rare example of a 12(b)(6) dismissal is ***Atteberry***, 430 F.3d 257 (nurse in government hospital could not have known injecting a patient with paralytic drug deprived patient of constitutional right).
[39] All citations in this section are to Plaintiff's Second Amended Complaint [Doc. 34].
[40] Specifically prohibited under the Texas Code of Judicial Conduct, Canon 2B.

- Publicly endorsing Munford's candidacy on Facebook (p. 13, February 24, 2018; Exhibit 6);

- Demanding that Diane "get her husband under control" and stop him from supporting Munford's primary opponent (pp. 8-9, October 23, 2017; p. 14, February 28, 2017);

- Demanding that Diane "get her husband under control" and stop him from engaging in and supporting political speech regarding the Second Amendment (which had become a central issue in Munford's campaign) (pp. 8-9, October 23, 2017; p. 14, February 28, 2017);

- Calling Diane off the bench and into Diane's chambers to confront her and tell her how upset she was about a post regarding Munford, attributing it (wrongfully) to Gerald (pp. 8-9, October 23, 2017);

- In the same conversation, after Diane says Baca-Bennett would need to speak directly to Gerald about his political activity, reminding Diane "who she works for" (pp. 8-9, October 23, 2017);

- Contributing content from her personal (or professional) Facebook page to criminally operated web site created solely for the purpose of defaming Diane and Gerald (a link to which was also shared in Facebook forums with Tarrant County family lawyers as members) (pp. 12-13, February 20-21, 2018; p. 18, March 5, 2018; Exhibit 19);

- Making public Facebook posts about Gerald's political activity, including identifying him as the husband of "Associate Judge Diane Haddock" (p. 13, February 24, 2018; Exhibit 7);

- Publicly posting on Facebook that "Diane's" district judge (Bill Harris) agrees Gerald's political ads are "deceitful" (p. 13, February 24, 2018; Exhibit 7);

- Perpetuating the rumor on Facebook that Diane had "resigned without notice" as an associate judge, and continuing to leave the post up for days, even after her original source (Bill Harris) had clarified it was false and had even told her in person that her post was not true (pp. 17-18, March 4-5, 2018; Exhibit 16);

- Making unofficial efforts at the Tarrant County Family Law Center (lawyer's lounge) to get Diane fired, public enough that several other employees who were not district judges and lawyers were well aware of them (p. 21, March – May, 2018);

- Publicly haranguing a lawyer in her courtroom because he represented Gerald in an unrelated matter, asking if Gerald is "insane or delusional," and claiming Gerald attempted to hide money through a PAC but "didn't do a good job;" calling Gerald "an evil man" and "a bully" (pp. 19-20, March 8, 2018; Exhibit 21);

- Asking that same lawyer in the same conversation in open court (with others present) "why Judge Haddock [Diane] would not resign" (pp. 19-20, March 8, 2018; Exhibit 21);

- Inviting, in the same conversation and in open court (with others present) that she hoped Gerald and/or Diane would sue her "so her kids could attend Nolan High School" (a private school in Arlington) (Exhibit 21, p. 1).

Diane's Second Complaint alleges and Diane will prove (at the appropriate time) that Baca-Bennett took every one of these non-judicial actions, among others. Baca-Bennett made threats to have Diane fired, made actual attempts to get her fired, publicly harassed and ridiculed Diane so that she would (just) resign, and sullied Diane's name and reputation as an associate judge-employee in an attempt to force Diane to resign – all in retaliation against Diane for nothing more than Gerald's political activity and Diane's refusal and inability to stop it.

### 3. **Baca-Bennett's request for prompt resolution of the qualified immunity defense prior to discovery appears to be moot.**

At page 17 of her Motion to Dismiss [Doc. 38], Defendant Baca-Bennett requests that her qualified immunity defense be addressed before discovery commences, and she asks the Court to issue a Rule 7(a) Order[41] that Diane replead to address the qualified immunity arguments.[42] Given that Diane has amended twice,[43] in the six months since then and the Court's indication in its Order Granting Leave [Doc. 33, p. 8] that "it is time to resolve the Rule 12 challenges," Diane believes

---

[41] (citing ***Schultea v. Wood*, 47 F.3d 1427, 1433 (5th Cir. 1995)**

[42] This section is verbatim to Baca-Bennett's original Motion to Dismiss filed on November 7, 2018 [Doc. 7]. As Diane's December 6, 2018, Response [Doc. 15] pointed out (pp. 3-5), Diane had already pled to overcome the qualified immunity defense in her very first pleading [Doc. 1].

[43] [Docs. 14 and 34].

a Rule 7(a) Order, or any response to this section of the Motion, is no longer necessary. She is certainly willing to amend, however, should the Court find it beneficial.

### III.    CONCLUSION

Diane was a faithful, 20-year veteran associate judge-employee in Tarrant County, until the Defendants, both individually and collectively, violated her First Amendment rights by retaliating against her for Gerald's political activity and filing this lawsuit. Plain and simple, they created and allowed a crippling, hostile work environment for no reason other than her husband's political involvement and her refusal and inability to stop it. Then they fired her for it and for filing this lawsuit. Moreover, the malicious manner in which Diane's termination was handled after a year of abuse has ended her family law career and should not be trivialized.  Because conduct rewarded is conduct repeated, all Tarrant County employees whose jobs may be controlled or influenced by the District Judges, and whose political views may differ from the judges' now run the risk of losing their jobs; and, their financial futures are in jeopardy.

Diane has sufficiently pled adverse employment in the form of a hostile work environment and termination, both in retaliation against her First Amendment rights to refrain from political speech and refusing to interfere with Gerald's, and her First Amendment right to file this lawsuit. The District Judges, sued in their official capacities, cannot hide behind the Eleventh Amendment, because the Eleventh Amendment does not bar claims seeking prospective injunctive relief, including reinstatement or front pay in lieu of reinstatement. Nor can Baca-Bennett hide behind qualified immunity regarding this longstanding and clearly established right of public employees to be free from First Amendment retaliation by their government employers and their employers' policymakers.  Without a fact-specific inquiry – improper at the 12(b)(6) stage – this Court simply cannot assess the District Judges' assertion that Diane's job as an associate judge-employee

necessarily required political loyalty to seven individual judges and to Tarrant County. At later stages, the District Judges and Tarrant County will have the burden to satisfy the *Pickering* balancing test, but not now.

The District Judges took an oath to uphold the laws of the United States and the State of Texas. When it came to Diane, they didn't. How many more Tarrant County employees must be stripped of their constitutional rights before Tarrant County and their policymakers – the District Judges – stop waving the flag of self-righteousness and pick up the Stars and Stripes?

Diane has exercised good faith in anticipating potential rulings by the Court on Defendants' Rule 12(b)(1) and 12(b)(6) motions – amending where appropriate, or, out of an abundance of caution, in places where it may not even have been necessary. Diane asserts confidently that her Second Amended Complaint is pled with sufficient specificity to overcome the District Judges' Rule 12(b)(1) and 12(b)(6) challenges. Should the Court disagree and have concerns of which Diane is currently unaware, she is willing to amend and address them. In the unlikely event the Court were to dismiss on 12(b)(1) grounds, any such dismissal should be without prejudice.

Respectfully submitted,

**THE HART LAW FIRM**

Walter L. Taylor
State Bar No. 19727030
***Wtaylor@thehartlawfirm.com***
6630 Colleyville Blvd, Suite 100
Colleyville, Texas 76034
Tel: (817) 329-7020
Fax: (682) 292-7406

**ATTORNEY FOR DIANE SCOTT HADDOCK**

## CERTIFICATE OF SERVICE

I hereby certify by my signature above that a true and correct copy of the foregoing document has this day been served via electronic service, upon the following on this 31st day of May, 2019:

M. Keith Ogle
David K. Hudson
Tarrant County Criminal District Attorney's Office
*mkogle@tarrantcountytx.gov*
*dkhudson@tarrantcountytx.gov*

Benjamin S. Walton
Assistant Attorney General
*Benjamin.Walton@oag.texas.gov*